71 Cal.2d 394 (1969)
THE PEOPLE, Plaintiff and Respondent,
v.
JERRY LEE O'BRIEN, Defendant and Appellant.
Crim. No. 12338. 
Supreme Court of California. In Bank. 
June 20, 1969.
 J. Perry Langford, under appointment by the Supreme Court, and Langford, Langford & Lane for Defendant and Appellant.
 Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.
 MOSK, J.
 Defendant was charged by information with the murder of Los Angeles Police Officer David Seibert and with six prior felony convictions. [fn. 1] Motions for change of venue and for suppression of evidence were denied. A jury found defendant guilty of first degree murder and fixed the penalty at death. Motions for new trial and reduction of sentence were denied. This appeal is automatic. (Pen. Code, 1239, subd. (b).) We affirm the judgment as to guilt but, under compulsion of Witherspoon v. Illinois (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we reverse as to penalty. *398
 On the morning of August 8, 1967, defendant appeared at a Foods Company market in Los Angeles, before the store had opened for business. He told the manager, Bruce Jessel, that he wanted to pick up a returned check which he had allegedly cashed there. Jessel replied he would have to wait until he received a notice from the bank that the check had been dishonored.
 Defendant returned about the same time on August 10. He told Jessel he had the necessary notice, but did not produce it. Jessel allowed him to enter, and took him to the cashier. As the two men stood outside the cashier's window, adjacent to the store office, defendant suddenly drew a .45-calibre automatic and told Jessel to open the office door. When Jessel replied that he could not do so because he didn't have the keys, defendant ordered him to open it or he would "put a hole" through him. Mrs. Anderson, the cashier, saw defendant raise the gun to Jessel's head and heard him say words to the effect of "I'll tell you once more and then I'll let you have it." She thereupon pressed a silent alarm, and unlocked the door from the inside. The two men entered the office.
 Defendant filled a large shopping bag with money from the safe, then stuffed more bills into his pockets. A salesman who came into the office was seized by defendant and told to stand with the others and keep quiet. The telephone rang, and defendant ripped it and a microphone out of the wall. As he left the office defendant said, "If anyone gets in my way, I'll kill 'em."
 As defendant proceeded towards the checkstand, Police Officer Seibert entered the market. A witness saw defendant crouch, take deliberate aim, and fire a shot; another witness saw the officer fall to the floor. A gun battle ensued, in which Officer Seibert received four bullet wounds; two of these, one in the chest and the other in the back, were fatal.
 Defendant fled from the store, leaving a trail of money in the parking lot. Jerry Canfield, an employee, was standing by Officer Seibert's patrol car, radioing for help. With "a grin on his face," defendant pointed his gun at Canfield and fired. Canfield dived into the police car, and a second shot rang out, striking the door. Defendant ran to a nearby automobile and drove away. Witnesses noted the description of the car and its license number.
 The car was subsequently found at an apartment house where defendant lived under the name of Martin Sykes. He had bought the car under that name on August 4, and on *399 August 9 had been seen cleaning it. His fingerprint was found on a flashlight in the glove compartment.
 Two weeks later defendant was taken into custody in Utah. A highway patrolman found him lying unconscious by the roadside, near a car that had apparently been demolished in an accident. A wallet containing identification in the name of Martin Sykes and several thousand dollars was recovered at the scene.
 At the trial, Jessel, Canfield, Mrs. Anderson, and a number of other eyewitnesses unequivocally identified defendant as the perpetrator of the robbery-murder.
 No defense was offered on the issue of guilt.
 [1a] We begin with defendant's contention that under the standard adopted in Maine v. Superior Court (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], the trial court assertedly erred in denying a pretrial motion for change of venue. The motion was predicated on dissemination of news reports on the case by two large metropolitan newspapers, by a smaller local newspaper, and by a radio station and several television stations. The contents of the reports included the particulars of the robbery and the shooting, the identification, apprehension, and charging of defendant as the alleged culprit, and references to defendant's prior record. Defendant contends that the publicity generated by these reports made it impossible for him to receive a "fair and impartial trial ... in the county." (Pen. Code, 1033.) The trial court reviewed the material in question and concluded, "The Court feels that the news releases, whether radio or television or the newspapers, were of short duration. The Court doesn't feel that, well, for example, they're inflammatory in any sense of the word. The Court at this time is going to deny the motion for change of venue." Defendant did not seek immediate relief by writ of mandate, but renewed the motion during the voir dire of the veniremen and after the trial jury was sworn; on each occasion the motion was denied. [fn. 2] *400
 [2] Defendant now takes the position that "The issue here is not whether the publicity was inflammatory, nor even whether the populace was inflamed. The question, rather, is whether the publicity, by its inflammatory nature, by the information it conveyed, or for any other reason, created a reasonable likelihood that in the absence of a change of venue a fair trial could not be had." But the "reasonable likelihood" standard was not the law of this state until our decision in Maine, and we expressly declared that decision to be prospective only: "The standard discussed herein will be applied on direct review in all cases which have not proceeded to trial at the date this opinion becomes final." (68 Cal.2d at p. 384 fn. 9.) As defendant concedes, by that date the trial in the case at bar had both begun and ended.
 [3] Yet we also stated in Maine (id at p. 382) that since the decision of the United States Supreme Court in Sheppard v. Maxwell (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507], "appellate courts must, when their aid is properly invoked, satisfy themselves de novo on all the exhibits and affidavits that every defendant obtains a fair and impartial trial." We therefore undertake an independent evaluation of the circumstances which, defendant claims, resulted in denying him a "fair and impartial trial" within the meaning of section 1033. [fn. 3]
 [1b] The record discloses that the venue of this offense lay in Los Angeles County, the most populous in the state; even the particular superior court district in which the trial was held is of substantial size, comprising a number of distinct communities. [fn. 4] With the sole exception of the local newspaper involved (The Daily Breeze), the pretrial press and broadcast *401 coverage of the case was largely limited to ordinary news reports of the shooting in mid-August 1967, the arrest of defendant two weeks later, and the filing of charges against him in September. The Daily Breeze continued its coverage into October, but thereafter printed only one item a month on the case, the last being on January 6, 1968. Voir dire of the jury did not begin until February 7, 1968, and it is apparent that the story had long since ceased to be newsworthy. The voir dire examination revealed that the jurors selected to serve either had no knowledge of the incident at all or a memory of it so dim as to be negligible. The defense accepted the jury as constituted, and did not exhaust its peremptory challenges.
 The factual distinctions between the present case and Maine (see, e.g., 68 Cal.2d at p. 388) are so clear as to require no further elucidation. After an examination de novo of the record, we are satisfied that the pretrial publicity in this case did not deprive defendant of a fair and impartial trial.
 Defendant next complains that his right to be secure against unreasonable searches and seizures was violated by the introduction in evidence of a certain yellowish-brown suit of clothes. The officer who took defendant into custody observed the suit in the back seat of defendant's wrecked car at the time of the arrest, but did not actually take possession of it until several hours later, after defendant had been removed to a hospital and the car had been towed to a service station. At trial a number of witnesses identified the suit as being or resembling the one worn by defendant when he committed the robbery-murder here charged.
 [4a] As will appear, we conclude from the relevant portions of the record that defendant through his trial counsel made and adhered to a tactical decision not to challenge the admissibility of this particular piece of evidence.prior to trial, it is true, defendant moved for return of property or suppression of evidence pursuant to Penal Code section 1538.5. [5] Subdivision (a) of the statute, however, contemplates that the moving defendant shall have the burden of identifying the "tangible or intangible thing" he seeks to suppress. Thus it has been held that where "the notice of motion did not specify that it was directed to [certain] evidence, the reasonable conclusion is that such physical evidence was not the object of defendant's attack in presenting his motion." (People v. Rose (1968) 267 Cal.App.2d 648, 651-652 [73 Cal.Rptr. 349].) Here the motion was apparently made *402 orally, and the record contains no such notice. In appropriate circumstances, this burden can also be discharged by a collective reference to all property of the defendant seized in a single specified search; a ruling on the legality of that search will be deemed to encompass each piece of evidence seized therein. [4b] But in the case at hand defendant sought to suppress items seized not in one search but at different times and places: i.e., outside his car at the time of arrest (the contents of his wallet) and inside his car after it had been towed to the service station (a set of master car keys). The mere fact that defendant made such a motion, therefore, does not enlighten us as to its scope.
 It follows that we are remitted to the transcript of the hearing itself. The clothing now challenged was mentioned in the testimony of the arresting officer, who described when and where he observed it and took it into his possession. Nevertheless, this clothing was not among the almost one dozen pieces of evidence offered and ruled upon at the close of the hearing. Counsel on appeal who did not represent defendant at trial, suggests that the clothing was not offered "presumably" because it had not been physically brought into court as an exhibit, and that the latter course had not been followed "because it had been received in evidence at the preliminary examination, [and therefore] its production at the suppression hearing was inconvenient." These considerations are not persuasive. [6] Items of evidence received at a preliminary examination can always be produced, if relevant, at the hearing on a motion to suppress. [7] Moreover, as defendant urges, the physical production of evidence at the suppression hearing is not a prerequisite to a ruling on its admissibility; failure to produce an item of evidence, accordingly, is no excuse for failure to request such a ruling with respect to that item. [4c] Nor can defendant now rely on an opening remark by the prosecutor that the search in question resulted in "the only physical evidence that will be presented at a trial in the future"; the burden of identifying the specific evidence sought to be suppressed remained on defendant, who should himself have raised the issue of the admissibility of the clothing if he desired to challenge it.
 That he did not desire to do so became crystal clear at trial. [8] We do not imply that a defendant who has unsuccessfully moved to suppress a certain item of evidence prior to trial must, in order to preserve his right to complain of the matter on appeal, renew his challenge thereto when *403 that item is subsequently offered at trial. The statute is explicit on this point, declaring in subdivision (m) that "The proceedings provided for in this section [and other sections not here relevant] ... shall constitute the sole and exclusive remedies prior to conviction to test the unreasonableness of a search or seizure. ..." Indeed, contrary to the apparent understanding of the parties below, we construe the statute to prohibit the renewal of such a motion at trial if it has previously been made in pretrial proceedings. Subdivision (h) provides that "If, prior to the trial of a felony or misdemeanor, opportunity for this motion did not exist or the defendant was not aware of the grounds for the motion, the defendant shall have the right to make this motion during the course of trial in the municipal, justice or superior court. Furthermore, the court in its discretion may entertain the motion during the course of the trial." By contrast, subdivision (i) expressly grants a defendant the right to "renew or make" the motion at a special hearing even though he may already have so moved at his preliminary examination (see subd. (f)). By omitting the word "renew" from subdivision (h), the Legislature must have intended to limit the operation of that provision to instances in which the motion is "made" or "entertained" for the first time at trial. (Cf. Gomes v. Superior Court (1969) 272 Cal.App.2d 702, 706, fn. 9 [77 Cal.Rptr. 539].)
 [4d] As we stated above, however, defendant has not shown that the clothing in question was a subject of the pretrial suppression hearing. Although piecemeal presentation of such a motion is ordinarily to be discouraged, defendant could therefore have moved for suppression or return of the clothing during the course of trial if he otherwise qualified to do so under the provision of subdivision (h). [9] But the record admits of no doubt as to defendant's intent in this regard: when the clothing was formally offered in evidence at the close of the People's case the prosecutor asked defense counsel if he wanted to "renew" his objection thereto, [fn. 5] and the latter replied, "I didn't have any objection to that." Counsel on appeal speculates that defense counsel declined to *404 object because he believed it either futile or unnecessary to do so in view of the denial of the pretrial motion to suppress; again the record is to the contrary, for counsel did "renew" his objection to the admission of other evidence--i.e., the contents of his wallet--that had specifically been ruled on by the court at the special hearing.
 [4e] Subdivision (m) declares further that review on appeal of the validity of a search and seizure may be obtained by the defendant "providing that at some state of the proceedings prior to conviction he has moved for the return of property or the suppression of the evidence." We conclude that defendant in the case at bar did not so move with respect to the clothing now challenged, either before or during trial, and hence that he may not raise the matter for the first time on appeal.
 [10] Defendant charges that the prosecutor was guilty of prejudicial misconduct in calling the victim's widow, Mrs. Seibert, as a witness during the guilt phase. He argues that her testimony "added nothing to the prosecution case" and that her crying on the stand "tended to inflame the passions of the jury" against him. The contention is not persuasive. The witness testified that she last saw the victim on the night before the shooting, and that he appeared to be well at the time. She also identified a photograph of the victim, which was subsequently admitted in evidence. These matters are relevant in a murder trial even though other witnesses may testify to similar effect, and there can be no question of the competence of this witness. As to the charge of prejudice, the record reveals that defendant's trial counsel--who was best able to appraise any such danger--made no objection to Mrs. Seibert's taking the stand or to any question she was asked. Counsel on appeal again speculates that trial counsel's failure to do so was motivated by a feeling of "futility" and a fear of "further inflaming the passions" of the jury. But had counsel in fact desired to make an objection, he could easily have done so out of the jurors' hearing. Mrs. Seibert's testimony was extremely brief, and it appears that trial counsel simply considered the matter too trivial to warrant interruption of the proceedings. We note, finally, that in the instructions on the guilt phase the court forbade the jurors to be governed by either sympathy, passion, or prejudice.
 [11] Under compulsion of Witherspoon v. Illinois (1968) supra, 391 U.S. 510, however, defendant must be accorded a *405 new penalty trial. During the voir dire examination [fn. 6] prospective juror Voznak stated that he would be "prejudiced" in favor of defendant "capital-punishmentwise." Defense counsel then put an elaborate hypothetical case to him, involving a murder for hire of a President of the United States and his entire family, and asked if the venireman would be able to participate in the death penalty verdict "under those circumstances." Mr. Voznak replied, "No. I don't see what the point would be." Without further inquiry, he was immediately excused for cause on a challenge by the prosecution.
 This rather cryptic sequence of questions did not result in making it "unmistakably clear" that the venireman "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. ..." (Witherspoon v. Illinois, supra, 391 U.S. at p. 522, fn. 21 [20 L.Ed2d at p. 784].) Accordingly, the exclusion of Mr. Voznak from the jury must be deemed constitutionally impermissible. [12] The Attorney General seeks to show compliance with the Witherspoon standard by arguing that if in the "extreme situation" hypothesized by counsel Mr. Voznak "would be precluded from participating in a capital verdict, he would be precluded in less extreme cases, including the present wherein there was but one victim." Such speculation, however, was foreseen by the Witherspoon court, and expressly rejected in its opinion: after holding that a death sentence cannot be carried out if the jury imposing it was chosen by excluding veniremen because they expressed general objections to or conscientious scruples against the death penalty, the high court explained (ibid): "Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment." (Italics added.)
 [13] We reach one other issue that may arise on retrial. There was no error in allowing the prosecution to prove, among other prior crimes committed by defendant, that he was guilty of escape from a correctional institution. Defendant asserts that such evidence may divert the attention of the jurors from the issue at hand to an inquiry into the ability of the Department of Corrections to prevent escapes by persons *406 in its custody. This appears to be an unlikely possibility, and in any event is one which the trial court can forestall by the exercise of its discretion over the introduction of collateral matters and by appropriate instructions.
 The judgment is reversed insofar as it relates to penalty. In all other respects it is affirmed.
 Traynor, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.
 McCOMB, J.
 I would affirm the judgment in its entirety.
NOTES
[fn. 1] 1. The allegations of prior convictions were withdrawn by the prosecution before the case went to the jury on the issue of guilt. During the penalty phase the prosecution introduced documentary proof of such priors, as well as evidence of other, more recent felonies of which defendant had not been convicted.
[fn. 2] 2. In so doing, the trial court reasoned as follows: "For the record, the Court feels that the original motion for change of venue, when I denied it I thought that frankly the publicity, regardless of news media, was not prolonged or inflammatory, and the Court is most satisfied with its first ruling after listening to the various respective jurors indicating their knowledge of the particular offense. And with some exception most of it has been extremely sketchy as far as the jurors are concerned. The Court, frankly, was pleased in the voir dire of the prospective jurors that the knowledge of the particular matter before the court was so sketchy so that I'm more than satisfied that we're getting a fair and impartial jury."
[fn. 3] 3. Defendant combines our recognition of the relevance of Sheppard in this respect with our later observation (68 Cal.2d at p. 383) that the "reasonable likelihood" standard "is fashioned on those suggested by the United States Supreme Court in Sheppard v. Maxwell"; from this premise defendant concludes that the standard is applicable in California since the date of Sheppard (June 6, 1966), despite our express language to the contrary in Maine. The argument is untenable. As we pointed out in Maine (ibid), "the Supreme Court explicitly declined to rest its reversal in Sheppard on the pretrial publicity. ..." Although the Sheppard opinion may well have contributed to the formulation of the "reasonable likelihood" standard, we adopted that standard in Maine not as a constitutional imperative but as an act of judicial administration. (Id at p. 384.) Accordingly, we were free to determine, for reasons of policy, that it would not take effect in California until the date of our decision.
[fn. 4] 4. The current population of the district is approximately 1,000,000, and that of the largest community, Torrance, is approximately 140,000. By way of comparison, the community involved in the Maine case, Ukiah, had a 1960 population of only 9,900, and that of the entire County of Mendocino is 51,200.
[fn. 5] 5. Although the statute contemplates that the issue will be raised by motion, a defendant who does so by the traditional procedure of objecting to the admission of the evidence on Fourth Amendment grounds should not be penalized merely for using the wrong words; such an objection, rather, should be construed whenever possible as a motion under subdivision (h).
[fn. 6] 6. We recognize that the trial in this case took place several months before Witherspoon was decided.