[Crim. No. 20834. Feb. 1, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
NICK RAMON VELASQUEZ, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Donald L. A. Kerson and Monica Knox, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—This case arises under the 1977 death penalty legislation (Stats. 1977, ch. 316, pp. 1256-1266) since superseded by the 1978 initiative currently codified as Penal Code sections 190 to 190.5. Defendant[1] was charged and convicted of the first degree murder of Mario Casas. The jury found two special circumstances: that the murder of Casas was willful, deliberate, premeditated, and personally committed by defendant during the commission of a robbery; and that defendant had been previously convicted of second degree murder. It fixed his punishment at death. Defendant's appeal is automatic.

---

[1]Defendant Velasquez was tried jointly with codefendant Angel Valencia. The jury did not impose a death penalty upon Valencia; consequently this appeal relates only to Velasquez. In this opinion the term "defendant" in the singular refers to Velasquez; "defendants" in the plural to both Velasquez and Valencia.

As we explain, we find no reversible error which affects the verdict of guilt or the finding of special circumstance. Since no juror otherwise qualified was excluded because of his automatic opposition to the death penalty, defendant lacks standing to assert that a death-qualified jury is unrepresentative or biased on the issue of guilt. His contention that substantial evidence does not support the special circumstance finding of *premeditated* murder during the commission of robbery has arguable merit, but the issue is immaterial since undisputed evidence supports the alternative finding that defendant had suffered a prior murder conviction.

The penalty verdict, however, must be reversed. The trial court improperly excluded a prospective juror although the voir dire failed to make it "unmistakably clear" that the juror "would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].) (Hereafter cited as *Witherspoon.*) Such error compels reversal of a judgment imposing a death penalty.

### 1. *Statement of the case.*

Defendant Velasquez and codefendant Valencia were charged by information with the murder of Mario Casas. The information alleged, as a special circumstance permitting imposition of the death penalty, that the defendants personally committed a premeditated murder during the commission of a robbery. (See former Pen. Code, § 190.2, subd. (c)(3).) As to defendant Velasquez, the information asserted a second special circumstance: that defendant personally committed the murder and had previously been convicted of second degree murder. (See former Pen. Code, § 190.2, subd. (c)(5).) The information also charged that in the commission of the murder defendants had used a firearm within the meaning of Penal Code section 1203.06, subdivision (a)(1); at trial the prosecution amended the information to charge firearm use also under section 12022.5.

Both defendants pled not guilty. Prior to trial, both presented a series of motions. First, they moved to strike the allegation of special circumstances as an abuse of prosecutorial discretion. The court heard testimony from Deputy District Attorney Trott, who explained the basis on which the district attorney decides whether to charge special circumstances, and denied the motion. Defendants further moved in the

alternative either for separate guilt and penalty juries or to limit the voir dire of the jurors concerning their views on capital punishment. After a lengthy hearing at which defendants presented expert testimony on the effect upon the jury of excluding persons opposed to the death penalty, the court denied the motion.

At trial the prosecution proved that the victim, Mario Casas, was an attendant at a Texaco gas station at the corner of Garvey and Delta Streets in Los Angeles. He was killed by a single .22 caliber bullet, fired at a distance of a few feet, which penetrated his lung and the pericardial sac. Death occurred shortly after 10 p.m. on November 3, 1977.

Earlier that evening defendant was at his mother's home helping Gilbert Seguin paint the kitchen. Valencia arrived there about 8 p.m. and later talked to defendant for about 20 minutes. About 9:30 defendant and Valencia borrowed Seguin's car to purchase more beer.

About 10 p.m. Maria Somers and her mother, Josefina Somers, purchased cigarettes at the Texaco station where Casas worked. As they drove from the station they observed Casas struggling with two men. One, whom they identified as Valencia, was holding Casas by the arm and shoulder. The other, whom they could not identify, was holding a gun to the attendant's stomach.

The Somerses drove away from the station, found a police officer, and returned with him to the station. When they arrived, the two men had left. Casas was lying on the ground, shot, holding the torn half of a dollar bill in his hand. Texaco employees later testified that some of the evening's gas receipts were missing.

Benjamin Leyva, who lives near the gas station, testified that he heard sounds of scuffling. He looked and saw one man struggling with the attendant while another stood by some distance away. He then heard a shot, and saw the man who had been struggling with the attendant push the attendant away. The attendant fell to the ground; the other man ran to a car, which drove away with the man who had been struggling with the attendant in the passenger's seat. Leyva examined the attendant, decided he was probably dead, and started toward a liquor store to call the police when the officers accompanied by the Somerses arrived.

A sheriff's deputy testified that between 10 and 11 p.m. he stopped a car matching the description of the vehicle involved in the gas station robbery. Defendant, the driver, and Valencia emerged and were arrested. A search of the vehicle turned up a .22 caliber pistol which ballistic evidence later showed was the murder weapon. Bills were wrapped around the grip of the pistol and fastened with a rubber band. The officers also discovered an envelope containing 16 $1 bills.

Both defendants testified. Valencia said that he had shot the attendant after an argument which began when the attendant called him "stupid" in Spanish. Valencia claimed he had not intended to rob the gas station; the attendant had thrown money in Valencia's face so, after he shot the attendant, he picked up the money and took it. Valencia denied that defendant had anything to do with the killing or robbery; he excused his own participation by claiming to be high on PCP and alcohol at the time. Defendant's testimony, consistent with that of Valencia, was that defendant was merely standing by when Valencia began an argument with the attendant and shot him.

The evidence thus established without contradiction that defendants were the two persons present at the murder scene. The evidence was in conflict, however, as to who actually shot Casas. The testimony of the Somerses indicated that both defendants participated in the robbery and murder, with Velasquez actually shooting the victim; that of Leyva and the defendants that Valencia shot the attendant with Velasquez an uninvolved bystander.[2]

The jury resolved this conflict against defendant Velasquez. It found both defendants guilty of first degree murder, thus rejecting testimony that Velasquez was a mere spectator of the crime. It further found the use of a firearm allegation true as to Velasquez but untrue as to Valencia, a verdict which clearly implies that Velasquez was the one who shot the attendant.

The special circumstance allegation against defendant Velasquez was based on two grounds. Prerequisite to either ground is a jury finding

---

[2]The testimony of Maria and Josefina Somers and that of Leyva, although apparently inconsistent, could be reconciled. On the one hand, the Somerses were not present when the shot was fired, so although they saw Velasquez with the gun it would be possible that Valencia fired the shot. On the other hand, Leyva did not testify that Valencia shot Casas, but that when he heard a shot he looked up and saw Valencia push Casas away, and Casas then fell down. That testimony is consistent with the possibility that Valencia was holding Casas when Velasquez shot the attendant.

that "The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death." (Former Pen. Code, § 190.2, subd. (c).) The prosecution then alleged, first, that "The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of...Robbery." (Former Pen. Code, § 190.2, subd. (c)(3).) It further alleged that "The defendant...has been convicted in a prior proceeding of the offense of murder of the first or second degree." (Former Pen. Code, § 190.2, subd. (c)(5).) The allegation against Valencia also alleged the special circumstance of premeditated killing in the course of a robbery.

The prosecution relied on the evidence presented at the guilt phase to show a premeditated killing during the commission of a robbery. To prove defendant's prior murder, the state introduced evidence of his 1967 conviction for the second degree murder of Mr. Isabel Sanchez. The jury found all special circumstance elements true as alleged and returned a verdict finding the allegation of special circumstance to be true as to both defendants.

At the penalty phase,[3] the prosecution described the 1967 murder and defendant's confession to that crime. Defendant then sought to present testimony that his confession was involuntary; the court refused to permit such testimony. The prosecution also presented evidence that defendant had been paroled from the 1967 conviction on September 8, 1975, that on May 10, 1977, he had been returned to prison for violation of the parole condition regarding use of alcohol, but was again paroled on September 23, 1977. The defense unsuccessfully objected to testimony of the parole violation on the ground that it had not received timely notice of such aggravating testimony as required by former Penal Code section 190.3. Defendant further presented favorable character testimony by his sister, his daughter, and his employer.

Defendant offered to present testimony from Clinton Duffy, former warden at San Quentin State Prison, to explain how the gas chamber worked. He also sought to present testimony from Deputy District Attorney Trott concerning the exercise of prosecutorial discretion in seeking the death penalty. The court rejected both offers. The jury returned a verdict of death as to defendant and life imprisonment without possibility of parole for Valencia.

---

[3]Before the penalty phase commenced defendants renewed their motion for a separate guilt and penalty jury. The court denied the motion.

## 2. *Issues relating to the guilt trial.*

Defendant makes no claim that the evidence is insufficient to sustain his conviction for first degree murder. The only contention he presents relating to the guilt phase of the trial concerns the selection of jurors. Defendant points out that *Witherspoon* permits the exclusion of that class of prospective jurors who, although able to render a fair and impartial verdict at the guilt phase, make it "unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial. . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) Defendant argues that this rule results in a jury at the guilt phase of the trial which is unrepresentative and biased in favor of conviction.

Our review of the record, however, reveals that none of the prospective jurors at defendant's trial fall within the class of those persons who, although otherwise qualified for service, could properly be excluded under *Witherspoon.* Only two prospective jurors were excluded because of their views on capital punishment. One, Mr. Edwards, indicated that he could not be fair and impartial at the guilt phase of trial, and was properly excluded for cause on that ground. Although the trial judge did dismiss Ms. Rundee because he concluded that she had made clear her automatic opposition to the death penalty, the trial court, as we explain in part 4 of this opinion, erred in that conclusion; Ms. Rundee's answers upon voir dire examination suggested that she would consider the death penalty under some circumstances.[4] Thus the rule which defendant challenges—as distinguished from the mistaken application of that rule by the trial court—did not affect the composition of the jury which tried him.

Accordingly, we conclude that defendant lacks standing to assert that the jury which tried him was unrepresentative or biased on the issue of guilt. The important issue he raises concerning the fairness of a death-qualified jury can be properly reached on direct appeal only in a case in which the *Witherspoon* test itself has actually excluded for cause a juror able to render a fair and impartial verdict at the guilt phase.[5]

---

[4]Defendant does not contend that the exclusion of Ms. Rundee as a result of Witherspoon error from the jury which determined guilt would constitute error requiring us to reverse the verdict at the guilt phase.

[5]We therefore deny defendant's request that we take judicial notice of the record compiled in People v. Moore (Super. Ct. Alameda Co., No. 67113B) relating to

### 3. *Issues relating to the findings of special circumstance.*

Defendant contends that substantial evidence does not support the findings of special circumstance.

Both alleged circumstances require a finding that "The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death...." (Former Pen. Code, § 190.2, subd. (c).) Defendant contends that no substantial evidence upholds the jury's findings that he acted with the intent to cause the death of Casas.

In *Estate of Kramme* (1978) 20 Cal.3d 567 [143 Cal.Rptr. 542, 573 P.2d 1369], we said in defining the term "intentionally caused the death of a decedent" in Probate Code section 258 that "For a result to be caused 'intentionally,' the actor must either desire the result or know, to a substantial certainty, that the result will occur." (20 Cal.3d at pp. 572-573.) The record before us here shows that the man who shot Casas, found by the jury to be defendant Velasquez, fired a shot at close range into the victim's chest below the left armpit on a line which caused it to penetrate both lungs and the pericardial sac. The jury could reasonably infer from such evidence that defendant fired the shot with intent to kill, or with knowledge to a substantial certainty that death would result.

The first alleged circumstance additionally requires a finding that the "murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of...Robbery."[6] Substantial evidence clearly supports the finding that the killing of Casas was willful and committed during the commission of a robbery, but defendant maintains that no substantial evidence supports the finding of a deliberate and premeditated killing.

---

the claim of defendants in that case that a death-qualified jury is unfair or unrepresentative.

[6]Defendant claims the special circumstance allegation relating to a killing during the commission of robbery failed to comply with former Penal Code section 190.4. That section provided that "Wherever a special circumstance requires proof of the commission...of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." Defendant was charged with a murder during the course of a robbery, but he was not charged with the crime of robbery. The literal language of former section 190.4 supports defendant's contention. The failure to charge robbery as a separate crime, however, was clearly not prejudicial since the information notified defendant that he must defend against the special circumstance of a premeditated killing committed during the commission of a robbery.

The issue of premeditation and deliberation is a close one. Numerous decisions have discussed and defined the concept of premeditation as it serves to distinguish first and second degree murder. ■ A killing is deliberate, they explain, if the killer acted "'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, [especially] according to a preconceived design.'" (*People* v. *Bender* (1945) 27 Cal.2d 164, 183 [163 P.2d 8]; *People* v. *Caldwell* (1955) 43 Cal.2d 864, 869 [279 P.2d 539]; *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942].) "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes...those homicides...which are the result of mere unconsidered or rash impulse hastily executed." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900-901 [156 P.2d 7]; see *People* v. *Parrott* (1959) 174 Cal.App.2d 301, 304-305 [344 P.2d 643].)

Defendant correctly points out that proof of a sudden killing in the course of an argument and struggle between defendants and the attendant would not prove a deliberate and premeditated murder. The testimony of Maria and Josefina Somers, however, suggests that Valencia restrained Casas while Velasquez held him at gun point for a brief period before shooting him. Arguably the jury could infer deliberation and premeditation on the basis of that evidence.

■ In arguing this issue, however, the prosecutor went far beyond the question of the inferences which reasonably could be drawn from the manner of the killing and the testimony of the Somerses. He noted that defendants talked together at length before the robbery, and carried out the robbery without masks, disguise, or any attempt to conceal the license number of the car. From those facts the prosecutor argued that defendants must have arrived at a preconceived plan to kill witnesses. We agree with defendant that such argument constitutes "[m]ere conjecture, surmise or suspicion[,] is not the equivalent of reasonable inference and does not constitute proof." (*People* v. *Bender, supra,* 27 Cal.2d 164, 186.)

Thus the only evidence of deliberation and premeditation which is "of ponderable legal significance...reasonable in nature, credible, and of solid value" (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; *People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193,

443 P.2d 777]) is the testimony of the Somerses and the nature of the killing itself. The trial court expressed doubt whether the evidence was sufficient to sustain the verdict on that point.[7]

We find it unnecessary to resolve that issue, however, because the finding of premeditation is unnecessary to sustain the special circumstance verdict.[8] That verdict as to defendant rests on two alternative grounds: either an intentional and premeditated killing in the commission of a robbery, or an intentional killing by one who has previously been convicted of murder. ■ Substantial evidence supports the finding that defendant intentionally killed Casas, and uncontested evidence proves that he had been previously convicted of second degree murder. Accordingly, the verdict of the jury finding a special circumstance which permits the jury to impose the death penalty is itself supported by substantial evidence.

4. *Issues relating to the penalty verdict.*

■ As we shall explain, in dismissing juror Maureen Rundee, the trial court acted contrary to the holding of the United States Supreme Court in *Witherspoon.* That error compels reversal of the penalty verdict.

*Witherspoon* held that a juror could not be excluded for cause in a capital case because of an abstract or generalized opposition to capital punishment; exclusion is proper only if the juror makes it "unmistakably clear...that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case...." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) California decisions since *Witherspoon* state the same standard. (See, e.g., *People* v. *Williams* (1969) 71 Cal.2d 614, 628 [79 Cal.Rptr. 65, 456 P.2d 633]; *People* v. *Vaughn* (1969) 71

---

[7]The judge stated: "It's a very close question. And I'm sure I know many judges on the Appellate Court that might very, very well rule that [the prosecutor] has presented insufficient evidence in this case. [¶] On the other hand, one of our districts, I think would find that the evidence was sufficient. So that is the problem."

[8]Defendant's reply brief contends that the finding of a special circumstance of premeditated murder in the course of robbery, if unsupported by the evidence, is prejudicial error at the *penalty* phase. He notes that the jury before fixing the penalty was instructed in accord with former Penal Code section 190.3, which states that "In determining the penalty the trier of fact shall take into account the existence of any special circumstance found to be true." Since we find that other grounds compel reversal of the penalty verdict, we do not reach the issue posed by defendant.

Cal.2d 406, 416 [78 Cal.Rptr. 186, 455 P.2d 122]; *People v. Risen-hoover* (1968) 70 Cal.2d 39, 56 [73 Cal.Rptr. 533, 447 P.2d 925].)

In light of the *Witherspoon* standard, we examine the following voir dire of Ms. Rundee:

"THE COURT: And how about your persuasion, if any, about the death penalty?

"MRS. RUNDEE: I have a strong persuasion about the death penalty.

"THE COURT: No strong—

"MRS. RUNDEE: I do have.

"THE COURT: Oh, what is that?

"MRS. RUNDEE: I'm against it.

"THE COURT: Are you so against it that you would just automatically vote against the death sentence should this case go into the stage of sentence?

"MRS. RUNDEE: Well, let me put it this way.

"I think there might be a hypothetical case in which a crime that was so heinous was committed that I would consider the death sentence. But I have not been able to think of a hypothetical of that nature.

"THE COURT: So that you would have to agree, at this point, that in your own thinking you would automatically vote for—or vote against the death sentence unless there was something really heinous?

"MRS. RUNDEE: Most likely, yes.

"THE COURT: Based on that, ma'am, I have to excuse you for cause."[9]

---

[9] The prosecutor had misgivings about the excusing of Ms. Rundee, and approached the bench. The following conversation ensued:

"MR. BOWES [Prosecutor]: As I understood her answer, she stated that she would, in the event that the case was so heinous.

"THE COURT: Right.

Ms. Rundee initially stated that she had "a strong persuasion about the death penalty," namely, that she was "against it." Such generalized statements of opposition to capital punishment do not disqualify a prospective juror. *Witherspoon* held expressly that "a sentence of death cannot be carried out if the jury...was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty...." (391 U.S. at p. 522 [20 L.Ed. at pp. 784-785].) When in *In re Seiterle* (1969) 71 Cal.2d 698 [78 Cal.Rptr. 857, 456 P.2d 129], a juror was excluded who stated "I don't agree with the death penalty," we held that "such general objections to capital punishment cannot properly serve as the basis for a challenge for cause under *Witherspoon*." (71 Cal.2d 698, 701.)

---

"MR. BOWES: But she was unable to think of a case that would be so heinous as to warrant the death penalty.

"Alone, I think that that would have been sufficient. But then she did—there was something more there that would indicate that she would actually consider the matter, didn't she?

"THE COURT: No. She's admitted that she would, except in a case that was so heinous, she would vote against the death penalty.

"See, it will have to be so heinous for her to consider it—but, otherwise, she's going to vote against it.

"Why are you objecting, of all people?

"MR. BOWES: No, I'm not objecting. I'm concerned with regard to the record.

"I just wondered if that was really sufficient, because she—whether or not she has met the criteria. It seems that—at least, I get the impression that there might be some cases where she could impose the death penalty.

"If that is so, then I would think that she should not, could not be excused.

"THE COURT: But she made a declaration that is tantamount to [being] absolutely against it, unless it is so heinous.

"I think now—I think that's ample cause to excuse.

"Maybe the defendants want to say something. She's the type of juror that they are apt to want to keep on.

"I certainly wouldn't think the district attorney—

"MR. BOWES: Your Honor, I'm not trying to say—if she were not a challenge for cause, I would kick her off on a peremptory challenge. That is not the point at all.

"I was just a little bit concerned as to whether or not there's sufficient cause. But perhaps—

"THE COURT: Well, let's hear from the defense counsel.

"I'll put her back in the box if you want to ask questions of her.

"MR. STAVEN [Attorney for Valencia]: I don't.

"I'm not agreeing that she be excused. I'm not getting into it, period.

"Maybe Mr. Manaster has some other thoughts.

"MR. MANASTER [Attorney for defendant]: The Court has indicated its feelings. So I agree with Mr. Staven's feelings.

"THE COURT: Well, he hasn't expressed his feelings.

"MR. STAVEN: That's right.

"MR. MANASTER: I think he's a lot like the jurors up there.

"THE COURT: I'm going to stand by my ruling. It's plenty clear to me.

"She's excused."

In the instant case the trial judge put his question based upon the *Witherspoon* test to Ms. Rundee but she did not reply affirmatively. Instead she stated that she *would* consider the death sentence in a "heinous" case.[10] That answer is plainly not the equivalent of an automatic rejection of the death penalty regardless of the evidence; to the contrary, Ms. Rundee would necessarily *be compelled to consider the evidence* to determine whether the case before her *was* of a heinous nature.

The 1977 California death penalty legislation contemplates that jurors will consider imposition of the death penalty only in a heinous case. It does not impose capital punishment for all homicides, all murders, or even all first degree murders. The death penalty is possible only if the jury finds one or more "special circumstances." These circumstances include murder by hire, murder by explosive, deliberate murder of a police officer or a witness, deliberate and premeditated murder during the commission of a dangerous felony, murder by torture, and multiple slayings. (See former Pen. Code, § 190.2.) In brief, the statute does not permit consideration of a death sentence in an ordinary homicide, but only when the killing is accompanied by some other circumstance which renders it particularly flagrant or atrocious. Furthermore, even a finding of special circumstance does not compel capital punishment; the jury must still consider evidence in aggravation or mitigation of the crime. (Former Pen. Code, § 190.3.) Thus Ms. Rundee's statement that she would consider the death penalty only in a heinous case, far from describing an extreme and automatic opposition to the death penalty, actually described the duty she would assume as a juror in a capital case.[11]

---

[10]The term "heinous" means "hatefully bad, flagrant, odious, atrocious" (Webster's New Internat. Dict. (2d ed. 1957) p. 1157); "enormously and flagrantly criminal; (Webster's Third New Internat. Dict. (1961) p. 1050).

[11]In denying defendant's motion for a new trial the trial court explained its reason for dismissing Ms. Rundee. The judge stated: "When she [Ms. Rundee] said she could not think of a hypothetical case so heinous to consider the death sentence, this was tantamount to saying she would automatically vote against the death sentence. And the reasoning is clear. Heinous is defined as, quote, 'enormously and flagrantly criminal,' and that definition will be found in most dictionaries, but is clearly set forth in Webster's Third International Dictionary at Page 1050, which would have to place it far beyond practically all murders. And, certainly, this was a case that could never, under any circumstances, be considered heinous.

"So when she said that, she is saying she could never invoke the death sentence.

"And while the Court didn't dialogue Rundee's knowledge of the Manson killings and other heinous crimes of wide publicity, the Court must assume that Rundee has

Finally, Ms. Rundee's reply that "most likely" she would automatically vote against the death sentence "unless there was something really heinous" does not disqualify her. In the first place, an "automatic vote" except in a heinous case is not an automatic vote "without regard to any evidence that might be developed at the trial" as required by *Witherspoon.* (See 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) In the second place, the response "most likely, yes" is not the unequivocal affirmation required by the California cases interpreting the *Witherspoon* decision. In *People* v. *Osuna* (1969) 70 Cal.2d 759, 769 [76 Cal.Rptr. 462, 452 P.2d 678], for example, a juror stated "I guess I feel strongly that I could not [impose a death penalty]"; we held her exclusion violated *Witherspoon.* Similarly in *People* v. *Chacon* (1968) 69 Cal.2d 765, 773 [73 Cal.Rptr. 10, 447 P.2d 106], a juror, asked if he could impose a death penalty, answered "I don't think so"; again we held the exclusion violated *Witherspoon.* (See also *People* v. *Vaughn, supra,* 71 Cal.2d 406, 414-416 (exclusion of juror Krokoski); *People* v. *Risenhoover, supra,* 70 Cal.2d 39, 56.)

---

not lived in a societal vacuum and that she expressed her opinion based on her lifetime of knowledge. This lifetime of knowledge found her not only opposed to the death sentence, but unable to conjure up in her thinking a crime which would permit its application.

"And would not the defendant Velasquez so agree were it as to a prospective juror stating words indicating an automatic vote for the death sentence? Of course not. Her language and her state of mind indicated clearly automation. And the Witherspoon case does not say that it has to be made in that specific language."

We cannot concur in the trial court's reasoning. We cannot assume that Ms. Rundee, when questioned by the trial judge called to mind the Manson murders and other notorious murders which occurred in her lifetime, resolved in her own mind that such killings were not heinous enough to call for a death penalty, and because of that mental classification was unable to think of any case sufficiently heinous. It seems more likely that on the spur of the moment and under the tension of voir dire examination no particularly heinous case sprang to her mind. In any event, *Witherspoon* permits disqualification only if the prospective juror makes it "unmistakably clear" (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785]) that he would automatically vote against the death penalty; it does not permit disqualification if that automatic vote is derived by a speculative deduction into the venireperson's mental process.

*People* v. *O'Brien* (1969) 71 Cal.2d 394 [79 Cal.Rptr. 313, 456 P.2d 969], illustrates the impropriety of excluding jurors because of their views on hypothetical cases. When juror Voznak indicated his bias in favor of defendant on capital punishment, defense counsel put an elaborate hypothetical case involving the murder for hire of the President and his family. When Vosnak indicated he would still be biased against capital punishment under such circumstances, he was dismissed for cause. Finding the dismissal erroneous, we stated that speculation based on hypothetical cases violated *Witherspoon*'s mandate that jurors "'cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment.'" (71 Cal.2d at p. 405 (Italics deleted), quoting *Witherspoon,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

The closest parallel to the present case is the exclusion of juror McClarin discussed in *People* v. *Vaughn, supra,* 71 Cal.2d 406, 412-413. Ms. McClarin stated that "I really feel that I object so strongly that I couldn't consider the death penalty." The court then inquired, "Mrs. McClaren, would it be fair to say that under no circumstances would you impose the death penalty in any kind of a situation that could be brought before you?" She replied, "Not being able to think of enough cases, I can't say for sure, but I certainly can't think of any myself right now in which I could possibly impose a death penalty." We held that exclusion of Ms. McClarin was error.

Ms. McClarin's initial statement of inability to impose the death penalty is less equivocal than any declaration of Ms. Rundee in the present case. Ms. McClarin's subsequent suggestion that she might be able to vote for the death penalty but could not think of a hypothetical case is almost exactly parallel to Ms. Rundee's "heinous case" example. Thus our conclusion in *Vaughn* that the exclusion of McClarin was *Witherspoon* error compels a conclusion here that the exclusion of Ms. Rundee was error.

The dissent argues that we should uphold the exclusion of Ms. Rundee by analogy to the exclusion of juror Rogers in *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64]. In *Floyd,* the court inquired of the panel whether "there is any juror that entertains such a conscientious opinion that he would under no circumstances vote for the death penalty" (1 Cal.3d at pp. 724-725); Ms. Rogers replied "I wouldn't vote for the death penalty." (P. 725.) Defense counsel asked: "No matter how heinous the crime?" She replied, "Yes, sir." (P. 728.) Counsel then put to her a ridiculous hypothetical case of a defendant who confessed to killing 10 women and children in a heinous manner, stated he would kill again, and offered to reveal the location of the bodies of additional victims for $100 each. In such a case, he asked, could she impose the death penalty. She replied, "I really don't know. . . . It depends on the degree. . . . I would have to get all the facts." (P. 729.) Finally, after counsel had finished questioning the panel, the court inquired of each juror whether in a proper case that juror would "have the courage to vote for a verdict of death?" Ms. Rogers answered, "no." The court asked again: "Even if you thought it was a proper case, you would not have the courage to vote for a verdict of death." She replied, "No, I wouldn't." The court then excused her from the jury. (P. 731.)

The majority in *Floyd* upheld the exclusion of juror Rogers on two grounds, neither of which is applicable to the present case. First, *Floyd* relied on the rule that "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court." (P. 725, quoting *People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) That rule may have been applicable in *Floyd* because Ms. Rogers gave conflicting answers on voir dire.[12] She first stated that she would not consider the death penalty no matter how heinous the crime but later, when given an example of a heinous crime, she said it would be a question of degree. After initially averring unequivocally that she would not vote for the death penalty in any case, she then stated that in a proper case it would depend on the facts, but still later concluded that even in a proper case she would lack the courage to impose the death penalty.

In contrast, the position of Ms. Rundee in the case at hand was unmarked by conflicting statements. In contrast to Ms. Rogers in *Floyd*, Ms. Rundee never stated that she would "under no circumstances" impose the death penalty, that she would not consider it even for a "heinous crime" or that even in a proper case she could not vote to impose the death penalty. Ms. Rundee's position was consistent throughout the brief voir dire that, although opposed to the death penalty, she would consider it in a heinous case. A rule for trial court resolution of conflicting answers thus has no application to the voir dire of Ms. Rundee in the instant case.

As an alternative ground for upholding the exclusion of Ms. Rogers, the *Floyd* court stated that "we have concluded Miss Rogers made it unmistakably clear that under no circumstances would she impose the death penalty." (1 Cal.3d at p. 725.) Since juror Rogers had previously stated that she did "not know" whether she would vote for it in a proper case and would "have to get all the facts," the court's conclusion must rest upon her later and unequivocal affirmation that even in a proper

---

[12]In his dissenting opinion in *Floyd*, Justice Peters questioned whether "the rule quoted from *Linden*, if applied in the scrupled-juror situation, could ever 'comport fully' with the *Witherspoon* holding that it must be 'unmistakably clear' the excluded juror would automatically vote against imposition of the death penalty. If the juror gave 'conflicting answers' to the question as to whether he could ever impose the death penalty and the conflict is not subsequently resolved on *voir dire*, it simply cannot be said that his automatic opposition to the death penalty is 'unmistakably clear.'" (1 Cal.3d at p. 741.)

case she would not vote for the death penalty.[13] That basis for the decision further serves to distinguish the present case in which juror Rundee went no further than to affirm that she would "most likely" vote against death unless the case was "really heinous"; an affirmation which does not demonstrate automatic opposition to a verdict imposing death.

■ The Attorney General argues that defendant waived the *Witherspoon* error by failing to object to the excusal of Ms. Rundee. The decisions of the United States Supreme Court and of the California courts have unanimously ruled that *Witherspoon* error is not waived by mere failure to object. Shortly after *Witherspoon*, the United States Supreme Court reversed and remanded two cases in which the *Witherspoon* error was raised neither at trial nor on appeal. (*Maxwell* v. *Bishop* (1970) 398 U.S. 262 [26 L.Ed.2d 221, 90 S.Ct. 1578]; *Boulden* v. *Holman* (1969) 394 U.S. 478 [22 L.Ed.2d 433, 89 S.Ct. 1138].) The court then granted certiorari in *State* v. *Wigglesworth* (1969) 18 Ohio St.2d 171 [47 Ohio Ops.2d 388, 248 N.E.2d 607], in which the Ohio Supreme Court had held the defendant waived *Witherspoon* error (see 248 N.E.2d at pp. 613-614), and reversed *per curiam*, citing *Witherspoon, Maxwell* v. *Bishop, supra,* and *Boulden* v. *Holmen, supra.* (*Wigglesworth* v. *Ohio* (1971) 403 U.S. 947 [29 L.Ed.2d 857, 91 S.Ct. 2284].) *Harris* v. *Texas* (1971) 403 U.S. 947 [29 L.Ed.2d 859, 91 S.Ct. 2291], also summarily reversed a lower court decision holding that failure to object waived *Witherspoon* error.

The California decisions similarly reject waiver of *Witherspoon* error. (See *People* v. *Risenhoover, supra,* 70 Cal.2d 39, 56; *In re Anderson* (1968) 69 Cal.2d 613, 618-619 [73 Cal.Rptr. 21, 447 P.2d 117].) *People* v. *Coogler* (1969) 71 Cal.2d 153 [77 Cal.Rptr. 790, 454 P.2d 686], the case on which the Attorney General relies, is distinguishable; defense counsel in *Coogler* did not merely fail to object, but affirmatively stipulated to the removal of the juror in question.

[13]We note that during voir dire the prosecutor asked Ms. Rogers "would you be willing to vote for a verdict of death under any particular circumstances?" She replied, "I can't think of any circumstances now." The prosecutor then moved to disqualify her, but defense counsel objected, observing that "The lady said she could not think of any circumstances. She is not saying there are no circumstances." The trial court denied the prosecutor's motion. It granted a subsequent motion to disqualify her only after she had replied with an unequivocal "no" to the question whether in a proper case she would "have the courage to vote for verdict of death." (See 1 Cal.3d at pp. 729-731.)

Thus the trial court in *Floyd* concluded that a juror's inability to think of a hypothetical case in which she would favor a death verdict is not sufficient to disqualify the juror under *Witherspoon*; only a clear and definite statement that in no case would she vote for death sufficed to excuse her for cause.

Moreover, in the present case the trial judge was alerted to the possibility of *Witherspoon* error by the prosecutor and further was informed that defendants did not consent to the dismissal of Ms. Rundee. (See fn. 9, *ante.*) Thus the function of an objection—to alert the court to the risk of error and permit it to avoid that error—was essentially fulfilled. Furthermore, the court's statement that "I'm going to stand by my ruling. It's plenty clear to me," suggests that any formal objection would have been futile.[14]

■ *Witherspoon* error requires reversal of a death sentence without proof of prejudice. (*Davis* v. *Georgia* (1976) 429 U.S. 122 [50 L.Ed.2d 339, 97 S.Ct. 399]; *In re Seiterle, supra,* 71 Cal.2d 698, 702; *In re Arguello* (1969) 71 Cal.2d 13, 15-16 [76 Cal.Rptr. 633, 452 P.2d 921]; *In re Anderson, supra,* 69 Cal.2d 613, 618-620.) The same rule arises by implication from the many decisions, including *Witherspoon* itself, which reverse a death penalty for erroneous exclusion of a juror without discussion of prejudice. (See, e.g., *People* v. *Vaughn, supra,* 71 Cal.2d 406; *People* v. *Osuna, supra,* 70 Cal.2d 759.)

The Attorney General argues that a different rule should apply when the prosecution fails to exhaust its peremptory challenges, and thus could have utilized a peremptory challenge to excuse the juror in question. We rejected an identical argument in *In re Anderson, supra,* 69 Cal.2d 613, 619. "*Witherspoon,*" we said, "did not discuss the effect of the existence of remaining peremptory challenges of the prosecution, but the broad language of the opinion establishes without doubt that in no case can a defendant be put to death where a venireman was excused for cause solely on the ground he was conscientiously opposed to the death penalty. According to our understanding of *Witherspoon,* reversal is automatically required if a venireman was improperly excused for cause on the basis of his opposition to the death penalty." The Supreme Court's summary reversal in *Davis* v. *Georgia, supra,* 429 U.S. 122, of a lower court decision finding *Witherspoon* error nonprejudicial, suggests that we interpreted the high court's opinion correctly.

---

[14]We agree with the Attorney General that defense counsel should not "play games" with the trial court, withholding an objection in the hope that the court will overlook reversible error. We cannot agree, however, that counsel in this case had any duty to question Ms. Rundee to clarify asserted ambiguities in her responses on voir dire. If defense counsel were willing to accept Ms. Rundee as a juror despite the claimed ambiguities, they have no duty to question her to help the prosecution develop a basis for a challenge for cause.

The erroneous exclusion of Ms. Rundee requires us to reverse the penalty verdict. We therefore need not and do not resolve the other contentions raised by the defendant relating to the penalty trial.

The judgment is reversed insofar as it relates to penalty. In all other respects the judgment is affirmed.

Bird, C. J., and Mosk, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it affirms the judgment of conviction of first degree murder with special circumstances. I respectfully dissent, however, from that portion of the opinion which reverses the sentence of death on the sole ground that one prospective juror, Maureen Rundee, was erroneously excused for cause. In my view, Mrs. Rundee was properly excluded from the jury panel on the basis of her statement on voir dire that *she could not conceive of a crime so heinous as to justify the death penalty.* As a unanimous verdict was required before a verdict of death could be imposed (former Pen. Code, § 190.4, subd. (b)), the People had a clear right to exclude Mrs. Rundee for cause.

Under well established principles, a prospective juror may be excluded from the panel if he makes it "unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to the evidence that might be developed at the trial of the case. . . ." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770], italics in original.) In the present case, Mrs. Rundee stated on voir dire that "I think there might be a hypothetical case in which a crime that was so heinous was committed that I would consider the death sentence. *But I have not been able to think of a hypothetical of that nature.*" (Italics added.) Thus, Mrs. Rundee could not imagine a crime so atrocious as to deserve the penalty of death. Such a response, I suggest, clearly disqualified her as a juror in a capital case under the foregoing *Witherspoon* test.

The majority contends, however, that Mrs. Rundee's response was "equivocal," for it demonstrated that she conceivably could impose death in a heinous case. The majority thereby mischaracterizes her answer: She merely admitted the hypothetical possibility that some *unimaginable* crime might someday, somewhere, occur which would warrant the extreme penalty. Such a response is wholly consistent with an unmistakably clear inability to impose the death penalty. Indeed, we

have so held in a case decided more recently than any of the earlier cases cited by the majority.

In *People* v. *Floyd* (1970) 1 Cal.3d 694, 724-725 [83 Cal.Rptr. 608, 464 P.2d 64], several prospective jurors, including Ms. Rogers, had stated on voir dire that they could not vote for a verdict of death. Defense counsel then framed an extremely heinous hypothetical example in the hope of demonstrating some equivocation on the part of these prospective jurors which might qualify them to sit despite their strong feelings against the death penalty. The hypothetical situation involved a defendant who had killed 10 women and children, had threatened to kill again on release from prison, and had offered to disclose the location of his victims' bodies for $100 each. Prospective juror Rogers, when asked if she could vote to impose death in such a case, replied that she did not "'know about that type of person,'" that the death penalty was a question of "'degree'" in such a case, that she would need to "'get all the facts,'" and that "'*I don't know* if I would [impose death] or not. *I really can't say.*'" (Italics added, *id.*, at p. 725.)

We held in *Floyd* that Ms. Rogers was properly excused for cause, as the totality of her responses made it unmistakably clear that under no circumstances could she impose the death penalty. Ms. Rogers' replies were certainly as "equivocal," as Mrs. Rundee's statements in the present case. Both prospective jurors expressed some reservations about the death penalty as applied to hypothetical examples involving extremely atrocious crimes. Indeed, the present case presents an even stronger example of a proper *Witherspoon* exclusion: In *Floyd*, Ms. Rogers acknowledged considerable difficulty with the hypothetical example posed by defense counsel. In the present case, Mrs. Rundee could not even imagine such a hypothetical!

*Floyd* reiterated a further rule which has specific application here. "'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding on an appellate court. [Citations.]'" (*Ibid.*) In the present case, the trial court carefully reviewed Mrs. Rundee's remarks and concluded that "When she said she could not think of a hypothetical case so heinous to consider the death sentence, this was tantamount to saying she would automatically vote against the death sentence. ...And, certainly, this was a case that could never, under any circumstances, be considered heinous." Under *Floyd*, the foregoing characterization of Mrs. Rundee's state of mind is binding on us. The

trial court, hearing the words, measuring the intonation of voice, and observing the facial expression, was in the better position to evaluate the depth of a prospective juror's beliefs regarding the death penalty.

Finally, I note that the prosecutor in this case had used only 11 of his 36 peremptory challenges. He affirmatively stated during voir dire examination that, but for the trial court's excuse of Mrs. Rundee for cause, he would have exercised one of his remaining peremptory challenges to excuse her. A reversal of the penalty under such circumstances unduly penalizes the prosecutor for failing to make what in effect would be a "protective" peremptory challenge and convincingly demonstrates the wholly technical nature of the majority's holding in this case.

*People* v. *Vaughn* (1969) 71 Cal.2d 406, 412-413 [78 Cal.Rptr. 186 455 P.2d 122], relied upon by the majority herein, is inapposite. That case, decided *prior to Floyd* (and cited in the *Floyd* dissent) involved a prospective juror whose responses were ambiguous regarding her ability to impose death. For example, the potential juror stated at one point that she would have a "difficult" time deciding the penalty issue, that she was "not sure" if she could impose death, and that she was "afraid" that her feelings on the matter would prevent her from imposing the extreme penalty. Prospective juror Rundee expressed no such equivocation in the present case.

I would affirm the judgment.

Clark, J., and Manuel, J., concurred.

**NEWMAN, J.,** Concurring and Dissenting.—I concur with the majority except that I believe we should decide the sufficiency of the evidence to support the jury's finding of the truth of the first alleged special circumstance, that "[t]he murder was willful, deliberate, and premeditated and was committed during the commission...of...[r]obbery..." (former Pen. Code, § 190.2, subd. (c)(3)). That finding will directly affect any retrial ensuing our reversal of the judgment insofar as it relates to penalty.

Former Penal Code section 190.3 provides: "In determining the penalty the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted...and the existence of any special circumstances

found to be true. . . ." Accordingly, on remand the finding that the murder was willful, deliberate, and premeditated and committed during commission of a robbery is likely to be submitted to the jury as a special circumstance to be considered in determining the penalty. If we were to strike the finding the jury would be advised as to the robbery itself as among "the circumstances of the crime" but would not be advised that the murder had been found to be willful, deliberate, and premeditated.

The majority says that we need not consider error in instructing the jury about the finding of the penalty phase of the prior trial, "[s]ince we find that other grounds compel reversal of the penalty verdict." (*Ante*, p. 436, fn. 8.) However, should we not direct the trial court to refrain from repeating its instruction at the penalty retrial if the finding did lack sufficient evidentiary support?

My view is that there was insufficient proof of deliberation and premeditation. The majority properly notes that there was no substantial evidence of any plan to kill and that "proof of a sudden killing in the course of an argument and struggle between defendants and the attendant would not prove a deliberate and premeditated murder." Yet their opinion raises the possibility of inferring deliberation and premeditation from the testimony of the Somerses, which "suggests that Valencia restrained Casas while Velasquez held him at gun point for a brief period before shooting him." (*Ante*, p. 435.) The Somerses' observation of that restraint occupied but a few seconds; they saw it first while driving out of the station and immediately sped for help. Their momentary observation seems insufficient to establish premeditation or deliberation in the absence of other proof of plan or motive. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) The Somerses did not see the shooting. The witness Leyva, who did hear a shot, testified it was preceded by a struggle.

The evidence is insufficient unless it supports a rational conclusion that the prosecution proved deliberation and premeditation beyond a reasonable doubt. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781, 2789]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 362-365 [157 Cal.Rptr. 769].) Thus I would supplement the majority's reversal with directions to the trial court (1) to strike the finding of the special circumstance of willful, deliberate,

and premeditated murder during the commission of robbery, and (2) to conduct the penalty retrial accordingly.

The petitions of both parties for a rehearing were denied February 27, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petitions should be granted.

By order dated June 30, 1980, the United States Supreme Court vacated the judgment of the California Supreme Court and remanded the cause for further consideration in light of *Adams* v. *Texas* (1980) 448 U.S. —.