[Crim. No. 22856. First Dist., Div. Four. Sept. 26, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE EUGENE BANKS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Parts A and D are not published, as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

**COUNSEL**

Jonathan M. Purver, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, J.**—Appellant, Maurice Eugene Banks, and Jose Jaloma Vieyra were jointly charged with the murder of David Kennemore (Pen. Code, § 187)[2] with a special circumstance allegation that it was committed while each was engaged in or was an accomplice to the commission or attempted commission of a burglary (§ 190.2, subd. (a)(17)(vii)). It was further alleged that during the commission of the murder: each had personally used a deadly weapon (a knife) (§ 12022, subd. (b)) and each had inflicted great bodily injury on the victim (§ 1203.075). Prior to trial, the People's motion to sever was granted, and appellant was separately tried.

The jury found appellant guilty of first degree murder, found the special circumstance allegation to be true, but found not true the allegations of personal use of a deadly weapon and great bodily injury. Appellant was sentenced to state prison for the term of life without possibility of parole. He appeals from the judgment of conviction.

### Facts

As employees of the Quarter Pound Giant Burger drive-in restaurant at Durant and MacArthur in Oakland, appellant and Vieyra were scheduled to work during the early morning hours of July 28, 1980.[3] During that shift, David Kennemore, the night supervisor for the chain of drive-ins, would routinely drop by the drive-in to ensure that it had adequate staff and supplies.

When Robert Howe, the drive-in manager, arrived at work at 6:30 a.m., appellant told him that he had been robbed.[4] Howe checked the cash register and the change drawer in the back of the drive-in which usually contained $140 and found both empty. Howe also discovered that a serrated kitchen knife and a butcher knife were missing.

---

[2] Unless otherwise indicated, all further statutory references are to the Penal Code.

[3] Unless otherwise indicated, all further dates are to the 1980 calendar year.

[4] Oakland Police Officer Sharon Jones took a robbery report from appellant about 5:55 a.m. on the 28th. Appellant told her that the robbery had occurred about 30 minutes earlier.

Kennemore's body was found at approximately 8:30 a.m. in the back of a company van, parked one-half block away from the drive-in. The body had 29 stab wounds: the face, neck, chest, arms and hands contained numerous contusions and abrasions. The autopsy revealed that Kennemore died from shock and hemorrhage caused by multiple stab wounds associated with blunt trauma to the head.[5]

After numerous interviews with the police, appellant admitted his involvement with the homicide and was arrested.[6] According to appellant's confession, Vieyra and he decided to steal the safe from the drive-in. On July 27, they rented a trailer and a dolly. The plan was to move the safe after Kennemore completed his rounds at about 4:30 a.m.

Appellant arrived at work at 11:45 p.m. Kennemore was already there, and left about 1 a.m. Vieyra left about 3 a.m. and returned about 4:15 a.m. with the trailer. He parked it first around the corner and then moved it to the back door of the drive-in.

Then, unexpectedly, Kennemore returned. Vieyra yelled that news to appellant; appellant moved the dolly behind the door. Appellant went to the front of the restaurant. When Kennemore entered he asked appellant what "was happening." Appellant said all was "cool." Appellant thought Kennemore must have been suspicious because of the trailer and the dolly, but Kennemore did not say anything. Kennemore checked the cash registers, the account books, and then went into the freezer.

At this point, Vieyra, who was standing outside near the drive-in window, motioned to appellant and to the knives lying on the table and silently mouthed, "give me the knife." Appellant handed Vieyra a six-inch knife, and also put a serrated knife inside his own back pocket.

When Kennemore emerged from the freezer, Vieyra punched him in the back and wrestled him to the floor. Appellant watched as Vieyra repeatedly stabbed and kicked Kennemore. Appellant claimed that he did not stab Kennemore but admitted that he held the knife to look as if he were "ready"[7] and that he hit and punched Kennemore a few times.

At some point, Kennemore pleaded with appellant to take his gun from his coat pocket and shoot him. Appellant removed the gun, but did not shoot. Instead, he put the gun inside Vieyra's car.

---

[5]Kennemore was a large man; 6 feet 1 inch tall, and weighing 200 pounds.

[6]Four taped interviews with appellant were played to the jury: they were not transcribed. During the first two interviews, appellant told the police that the restaurant had been robbed. During the latter two interviews, he admitted his involvement.

[7]Appellant could not explain how his wrist was cut during the scuffle.

Appellant drove Kennemore's van to the back door of the drive-in and helped Vieyra drag Kennemore into the back of the van. Appellant then drove the van around the corner and parked it. When he returned he helped Vieyra clean up the blood. They removed $180 from the cash register and cash drawer. Unable to move the safe, they left it in the middle of the room. After Vieyra left, appellant reported by telephone to the police that he had been robbed. He pulled papers from the desk drawer to simulate a robbery. Appellant and Vieyra returned the trailer, divided the $180, and disposed of the gun, Kennemore's wallet and credit cards.

*Review*

A.[8]

. . . . . . . . . . . . . . . . . . . . . . . . .

B.

*The jury was improperly instructed on the doctrine of aiding and abetting.*

Appellant challenges the aiding and abetting instructions given in conjunction with the first degree murder instructions. (CALJIC Nos. 3.00 (1979 rev.) and 3.01 (1979 rev.).)[9] The first flaw he finds is their failure to tell the jury that an aider and abettor must share the criminal intent of the perpetrator.

Little bright line assistance is available to the trial courts in determining what mental state one needs to qualify as an aider and abettor. Language

---

[8] See footnote 1, *ante.*

[9] CALJIC No. 3.00 (1979 rev.) defines principals: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who, with knowledge of the unlawful purpose of the one who does directly and actively commit or attempt to commit the crime, aid and abet in its commission or attempted commission, or [¶] 3. Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission. [¶] [One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

That instruction was followed by CALJIC No. 3.01 (1979 rev.) which defines aiding and abetting: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]"

employed by the California Supreme Court can be characterized as inconsistent,[10] and not surprisingly the Court of Appeal is fissured.

One line of cases headed by *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], requires that one share the criminal intent of the perpetrator. (See also *People* v. *Petty* (1981) 127 Cal.App.3d 255, 263 [179 Cal.Rptr. 413]; *People* v. *Brown* (1981) 116 Cal.App.3d 820, 826-827 [172 Cal.Rptr. 221].) The opposite line of authority holds that there is no separate intent element required in California for aiding and abetting. (See *People* v. *Green* (1982) 130 Cal.App.3d 1, 8 [181 Cal.Rptr. 507].)[11]

In between these poles are cases limiting *Yarber* to its facts, and interpreting it as holding that instruction on intent is required "only where a reasonable inference can be drawn from the evidence that despite defendant's knowledge of the perpetrator's wrongful purpose, defendant acted for an independent, lawful purpose." (*People* v. *Francis* (1982) 129 Cal.App.3d 241, 255-256 [180 Cal.Rptr. 873]; see also *People* v. *Flores* (1982) 128 Cal.App.3d 512, 525-526 [180 Cal.Rptr. 368]; *People* v. *Fagalilo* (1981) 123 Cal.App.3d 524, 533-534 [176 Cal.Rptr. 698]; *People* v. *Lopez* (1981) 116 Cal.App.3d 882, 888-889 [172 Cal.Rptr. 374].) There are also decisions which refuse to enter the dispute, assume error in failing to give instructions which do not contain the intent requirement, and simply review the effect of the error. (See *People* v. *Lopez, supra,* 116 Cal.App.3d at pp. 888-889; *People* v. *Patrick* (1981) 126 Cal.App.3d 952, 967-968 [179 Cal.Rptr. 276].)

*Yarber* involved an unusual and unusually sordid fact situation: Bonnie Yarber was convicted of one count of aiding and abetting her husband in his oral copulation of a minor. The evidence showed that on one occasion Bonnie engaged in oral copulation with her husband, which was followed by the same conduct between him and a minor, Mary. The jury was instructed, in accordance with CALJIC No. 3.01, that the wife was liable as

---

[10]For instance, in *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961], the Supreme Court defined the elements of aiding and abetting as follows: "She was an aider and abettor if, with knowledge of Terry's criminal purpose, she encouraged, promoted, or assisted in the commission of the crimes. [Citations.]" The Supreme Court offered this quite different analysis in *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335], cert. den., 429 U.S. 805 [50 L.Ed.2d 65, 97 S.Ct. 38]: "[c]riminal liability as a principal attaches to those who aid in the commission of a crime *only if they also share in the criminal intent* [citations] or, in the language of section 31, abet the crime. Mary was thus an accomplice only if at the time she acted she had 'guilty knowledge and intent with regard to the commission of the crime.' [Citation.]" (Fn. omitted, italics added.)

[11]Similar results were reached in two published cases in which the Supreme Court has granted a hearing. (See *People* v. *Valenzuela,* Crim. 22648 [(1982) Cal.App.] and *People* v. *Beeman,* Crim. 22525 [(1981) Cal.App.█])

an aider and abettor " 'if, with knowledge of the unlawful purpose of the perpetrator of the crime, [s]he aids, promotes, encourages or instigates by act or advice the commission of such crime.' " (*People* v. *Yarber, supra,* 90 Cal.App.3d at p. 912, fn. 7.) The Court of Appeal held that the jury should have been instructed that "a person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator, [s]he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime." (*People* v. *Yarber, supra,* 90 Cal.App.3d at p. 916.) Because of the "peculiar facts" of the case, the Court of Appeal concluded that the error in the instruction required reversal: "it is reasonably probable that the jury found Bonnie Yarber guilty because they believed that her act had encouraged Mary to engage in the sex act with Wendol and because she had knowledge of Wendol's purpose, without regard to whether she intended that her act would have such effect. . . ." (At pp. 916-917, fns. omitted.)

The *Yarber* court reasoned that although intent can be inferred from the aider and abettor's knowledge of the perpetrator's purpose, it was not for the courts to hold that as a matter of law that inference must be drawn: "Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid can be *inferred.*" (*Id.,* at p. 916, italics in original.)

*People* v. *Petty, supra,* 127 Cal.App.3d 255, holds that a *Yarber* instruction or something akin to it should be given in all aiding and abetting cases: "A lesser standard, based upon knowledge of the principal's purpose, or of the likelihood that the purpose will be aided by particular acts, may be appropriate in states which distinguish among degrees of complicity [citation], but where, as in California, the aider and abettor is guilty of the same crime, and subject to the same punishment, as the principal, the *Yarber* standard appears to be more compatible with legislative intent." (At p. 263.)

■ We hold as do *Yarber* and *Petty* that criminal intent is an element of aiding and abetting in California. A contrary result would, in our view, come dangerously close to equating aiding and abetting to strict liability. If intent is a necessary element to convict one of being the perpetrator of the underlying felony (e.g., robbery), one charged with aiding and abetting that criminal activity deserves no less, especially in this state where the penalties are identical and where the aider and abettor is treated as a matter of law as a principal (§ 31).[12]

[12]Prior to the 1974 revision, CALJIC No. 3.01 required a finding of criminal intent: "A person aids and abets the commission of a crime if he knowingly and *with criminal intent*

■ For the foregoing reasons, we conclude that the trial court erred by giving instructions which omitted the element of intent and that it thereby failed to comply with its duty to instruct *sua sponte* on all essential elements of the charged offense. (Cf. *People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892], disapproved on other grounds in *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Sanchez* (1950) 35 Cal.2d 522, 528 [219 P.2d 9]; *People* v. *Hamilton* (1978) 80 Cal.App.3d 124, 133 [145 Cal.Rptr. 429].)

■ Such an instructional error requires reversal where the omission relates to a "material issue presented by the evidence." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *Hamilton, supra,* 80 Cal.App.3d at p. 133.) Reversal is not required where there is no evidence to the contrary deserving of consideration, and the reviewing court can say that the element was established as a matter of law. (*People* v. *Ford, supra,* 60 Cal.2d at pp. 792-793 [failure to instruct that specific intent to steal is an element of robbery not reversible where the evidence permitted no interpretation other than that the defendant entertained such intent when he demanded the victim's money at gunpoint]; see *People* v. *Thornton* (1974) 11 Cal.3d 738, 768, fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267],[13] [failure to instruct on a charge of kidnaping for purposes of robbery that the asportation must be significant in time or space and must substantially increase the risk of harm to the victim over and above that present in the crime of robbery not reversible error where there was no evidence worthy of consideration to support an inference to the contrary].)

■ This is not a case where it can be said that the jury could reasonably have found that appellant with knowledge of Vieyra's purpose aided him without criminal intent. Lack of intent was raised neither by the evidence nor by argument by either the prosecution or defense counsel.[14] Nor is there

---

aids, promotes, encourages, or instigates by act or advice, or by act and advice, the commission of such crime." (CALJIC No. 3.01 (3d ed. 1970) p. 71, italics added; see *People* v. *Green, supra,* 130 Cal.App.3d at p. 13, fn. 1 (conc. opn., Miller, J.); *People* v. *Yarber, supra,* 90 Cal.App.3d at pp. 912-913.)

[13]Disapproved on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d 668.

[14]Defense counsel's focus during argument was on the insufficiency of the evidence of great bodily injury and personal use of a weapon, and on whether the evidence showed beyond a reasonable doubt that the intent to steal was formed prior to the homicide. He made no challenge to appellant's liability as an aider and abettor; the question he posed to the jury was whether that liability was for first or second degree murder.

any evidence worthy of consideration to support an inference that appellant lacked the requisite intent. We therefore conclude that it is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the instructional error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Cal. Const., art. VI, § 13.)

That conclusion does not dispose of appellant's alternative analysis of the effect of these instructions: i.e., that failing to advise the jurors that intent was required created a mandatory presumption of intent, relieving the prosecution of its burden of proving each element of the crime beyond a reasonable doubt. He urges that so viewed the omission is a violation of due process (see *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 521-524 [61 L.Ed.2d 39, 49-51, 99 S.Ct. 2450]; *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 156-163 [60 L.Ed.2d 777, 791-795, 99 S.Ct. 2213]; *People* v. *Roder* (1983) 33 Cal.3d 491, 496-504 [189 Cal.Rptr. 501, 658 P.2d 1302]; *People* v. *Henderson* (1980) 109 Cal.App.3d 59, 63-65 [167 Cal.Rptr. 47]; *People* v. *Hedrick* (1980) 105 Cal.App.3d 166, 171-172 [164 Cal.Rptr. 169]) and that such error is reversible per se.

Even assuming for purposes of argument that such an omission transmutes the instructions into a mandatory presumption,[15] it does not follow that such error would be reversible per se. Neither the United States nor the California Supreme Court has decided whether an instruction violating due process is reversible per se or is subject to the harmless beyond a reasonable doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (See *Sandstrom* v. *Montana, supra,* 442 U.S. at pp. 526-527 [61 L.Ed.2d at pp. 52-53]; *People* v. *Roder, supra,* 33 Cal.3d at p. 504.) As noted in *Roder,* the majority of courts which have faced the issue since *Sandstrom* have determined that the *Chapman* standard applies. This is also true for the Ninth Circuit. (See *McGuinn* v. *Crist* (9th Cir. 1981) 657 F.2d 1107, 1108-1109, cert. den., 455 U.S. 990 [71 L.Ed.2d 850, 102 S.Ct. 1614].) We find that *Chapman* is the proper standard of review of the alleged instructional error.

Here the jury was presented with two theories of first degree murder: (1) a premeditated and deliberate killing and (2) a killing committed "in the

---

[15]Responding to the identical argument, Justice Grodin noted: "Undoubtedly certain instructional error is of such a fundamental nature as to deprive the defendant of a fair trial, and thus to require reversal even where the evidence of guilt is overwhelming. [Citations.] We would push abstract logic beyond the requirements of justice and common sense, however, were we to apply that principle to a case such as this, where the state of the law governing the instruction was and remains unsettled, where the gap between the instruction given and the more appropriate instruction is imperceptible in all but a narrow range of cases, and where the more appropriate instruction was neither requested nor indicated by the state of the evidence or argument." (*People* v. *Petty, supra,* 127 Cal.App.3d at p. 265.)

perpetration of, or attempt to perpetrate, . . . burglary, . . ." (§ 189.) The jury was instructed that in order to find appellant guilty of such a crime as an aider and abettor, it would have to find that: (1) he knew that Vieyra intended to deliberately kill Kennemore; or (2) he knew that Vieyra intended to commit theft and that the killing occurred during the commission or attempted commission of the burglary. It distorts reality to suggest that a jury could reasonably conclude that appellant was acting without intent to aid Vieyra in the commission of the murder when appellant handed Vieyra a knife, put another knife in his own pocket and joined in striking Kennemore while Vieyra struck and stabbed him. No evidence supports such a conclusion and it was not even suggested by counsel in his argument to the jury.

## C.

*The case must be remanded to the trial court so that it can exercise its discretion as to whether the special circumstance should be stricken pursuant to section 1385.*

After the trial of this case, the California Supreme Court decided *People v. Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029], which held that a trial court is authorized by section 1385 to "dismiss special circumstance findings in order to make it possible for a person to be eligible for parole." (*Id.,* at p. 489, fn. omitted.) Since the trial court in *Williams* had indicated that it would strike the special circumstance if it had the power to do so, the Supreme Court remanded to allow the trial court to exercise its discretion. (*Id.,* at p. 492.)

There is nothing in the record to support a finding that the trial court exercised its discretion under section 1385.[16] There was no hearing to consider mitigating circumstances because the death penalty was not sought by the prosecution. The only comments by the trial court at the sentencing hearing were that it had read and considered the probation report and that it was sentencing appellant to state prison for the term prescribed by law: for life without possibility of parole.

---

[16]Also pending before the court at the sentencing hearing was a motion to strike the special circumstance premised on the prosecution's failure to separately plead and prove the substantive offense of burglary. (See § 190.4, subd. (a); *People* v. *Velasquez* (1980) 26 Cal.3d 425, 434, fn. 6 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and cause remanded in *California* v. *Velasquez* (1980) 448 U.S. 903 [65 L.Ed. 1132, 100 S.Ct. 3042], reiterated, 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952]; *People* v. *Green* (1980) 27 Cal.3d 1, 52 [164 Cal.Rptr. 1, 609 P.2d 468].) The trial court's comment in conjunction with that motion—i.e., that it felt that appellant had received a fair trial—does not compel the inference, suggested by the People, that it understood an inherent power to strike.

Thus the matter must be remanded to allow the trial court to exercise discretion under *Williams.* (Accord *People* v. *Chambers* (1982) 136 Cal.App.3d 444, 457-458 [186 Cal.App.3d 306].)

D.[17]

. . . . . . . . . . . . . . . . . . . . . . .

*Conclusion*

The case is remanded to the trial court for exercise of the court's discretion to determine whether there is a basis for dismissing the special circumstance finding. In all other respects, the judgment is affirmed.

Caldecott, P. J., and Sullivan, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 1, 1983.

---

[17]See footnote 1, *ante.*
*Assigned by the Chairperson of the Judicial Council.