[Crim. No. 15420. Fourth Dist., Div. One. Oct. 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ANGEL ACERO, Defendant and Appellant.

■■■■■■■■■■■■

**COUNSEL**

Victoria Sleeth, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—Angel Acero and Richard Copeland were charged with the attempted murder (Pen. Code, §§ 187/664)[1] or aggravated assault (§ 245, subd. (a)) of Steven Queen. Copeland was alleged to have personally inflicted great bodily injury on the victim. (§ 12022.7.) Acero was charged with use of a firearm (§ 12022.5) and Copeland with vicarious use of a firearm (§ 12022, subd. (a)). Both men pleaded not guilty.

During the course of a jury trial, Acero's motion to dismiss the weapon enhancement was granted. The People were permitted to amend the information to allege use of a dangerous weapon (a BB gun) under section 12022, subdivision (b), instead of a firearm under section 12022.5.

Both Acero and Copeland were found innocent of the aggravated assault charge. Copeland was also acquitted on the attempted murder charge. Acero, however, was found guilty of attempted murder, and the weapon enhancement was found true. Acero received a prison sentence. He appeals, claiming several instructional errors kept the jury from considering his defense of lack of intent to kill the victim. We reverse the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

## FACTS

On the evening of June 4, 1982, and the early morning hours of June 5, 1982, Randy Vasquez held a graduation party at his home. The party attracted a number of uninvited guests, including Richard Copeland and Angel Acero. Over the course of the evening, hard feelings developed between Copeland and Vasquez' friend Steven Queen. Voices were raised, a shoving match began. Observers separated Queen and Copeland and escorted Copeland out the front door. Copeland, Acero and several of their friends left the party but not before Copeland yelled at Queen to come out of the house and fight. The group drove off at about 2 a.m., with Copeland threatening Queen he would return and get him.

By 4:30 a.m. the party was still going on but only a handful of people remained. Queen was in Vasquez' backyard. A group of men entered the yard through a side gate. One of the men stabbed Queen and another stood by holding a rifle (probably a BB gun), which he pointed at the other partygoers. While consistent in general, testimony of the witnesses to the stabbing differed in detail.

Patricia Martinez, who knew Acero, heard one of the men state as they entered the backyard "We are back, and we are going to . . . stab you." Martinez noted Acero pointed a rifle at her. After seeing Copeland attempt to stab Queen, she ran into the house for help. Queen had a recollection of being attacked but could identify none of the attackers. Debbie Andersen, Queen's girlfriend, had seen Acero earlier in the evening. She was in the house when she heard Queen scream the men were back, had knives and were stabbing him. Andersen ran out of the house and observed Copeland making stabbing motions in Queen's direction. She noticed Acero held a rifle and she saw other figures standing in the shadows. Andersen pulled Queen away and helped him into the house. As she did so, she noticed Acero fall into a Jacuzzi.

Randy Vasquez, who knew Acero, looked out the window of his house when he heard loud noises in the backyard. He noticed someone with a rifle had fallen into the Jacuzzi and was under water. As Vasquez watched, Acero climbed from the spa and departed. Brenda Havlik, who had seen Acero before, saw Copeland making stabbing motions in Queen's direction and Acero holding a rifle and hitting Queen with the butt end of the weapon.

Jeffrey Bond was in Vasquez' house about 4:30 a.m. when he heard Queen scream. Bond ran to the backyard and saw Acero point a rifle at him and the other partygoers coming from the house. Bond saw Acero back up

and fall into the Jacuzzi. Acero got out of the Jacuzzi and he and several other men ran out the rear gate.

Ellen Vasquez, who had seen Acero earlier in the evening, heard Martinez yell Queen was being stabbed. Vasquez ran to the backyard and observed one man holding Queen, another making stabbing motions toward him and a third man, Acero, pointing a rifle at him.

Sometime after 4 a.m., Joseph Fox was standing on the street in front of Vasquez' house. Fox first noticed four persons walking toward the house; two or three minutes later he noticed several people running toward him, get into a car and depart.

Because Acero had been identified as a suspect in Queen's stabbing, Officer Irving Franzen went to Acero's home about 5 a.m. on June 5, 1982. He arrested Acero and received permission from him to examine the vehicle parked outside Acero's home, which Fox had identified as the vehicle he saw leaving Vasquez' house earlier that morning. The car's hood was warm and there was a puddle of water on the driver's floorboard. Acero's hair was damp.

By way of defense, Copeland and Acero admitted they had a disagreement with Queen in the late evening and early morning hours of June 4 and 5, 1982, and were asked to and did leave Vasquez' party. They took one of their compatriates home, then drove to Acero's house. There they met Acero's brother and several of his friends. They agreed Copeland would go home to drop his car off, and Acero and the others would pick him up in their van, intending to return to the party. Copeland testified their purpose in returning was simply to get more beer. Additionally, Acero testified he wanted to escort home a woman he had met at the party.

Before the group got to Vasquez' house, they were stopped by a police officer summoned by Vasquez' mother during the earlier altercation. The officer told them to go home. Copeland and Acero claimed they did exactly that.

Acero took Copeland home first. On the way, Acero and one of his brother's friends had been discussing going hunting together, and when they reached Copeland's home Acero asked if he could borrow Copeland's BB gun. Copeland agreed. Acero gave the gun to the friend to hold it for him because Acero's mother would not allow guns in the house.

Acero dropped off the others and he and his brother returned home at 3:45 to 4 a.m. They ate a snack and went to bed. When the police arrived

around 5:30 a.m., Acero was asleep. Family members corroborated Acero's testimony, saying he came home at 3:45 a.m. and never left again; they were sure he had not been driving the family car because Acero did not have the keys, and, in any event, the noise would have awakened them. Acero's father said the roof of the car had a leak and he had washed the car the night before, explaining the puddle of water on the driver's side.

On rebuttal, testimony suggested Acero and Copeland were separately admonished and questioned by Harold Goudarzi. Copeland admitted he was at the party and was thrown out but said no more. Acero told Goudarzi he took Copeland home but the others returned to the party to steal beer. The BB gun was taken along to scare Queen. Acero claimed Alfaro, one of his brother's friends, pointed the gun at Queen, and Queen came at Alfaro. Vega, another of Acero's brother's friends, pulled Queen away from Alfaro and stabbed him and they all fled. At trial Acero testified he made up the story for Goudarzi so he could be released.

Shortly after the stabbing, Queen was taken to a hospital for treatment. He had three penetrating stab wounds to the right chest, two penetrating stab wounds to the left chest, several other nonpenetrating wounds to the chest and a stab wound to the groin area penetrating the abdomen. The stab wounds resulted in a partially collapsed lung and lacerations to the stomach and liver. If unattended, these wounds would have resulted in Queen's death.

## DISCUSSION

### I

### INSTRUCTIONAL ERROR

 Acero was convicted of the attempted murder of Steven Queen on the theory he aided and abetted the person who stabbed Queen.[2] Acero urges reversal of his conviction on the ground the jury was inadequately instructed on the criminal intent necessary to convict a defendant as an aider and abettor of the crime of attempted murder.

#### A. *Instruction on Aiding and Abetting*

 The jury was instructed on aiding and abetting with CALJIC No. 3.00, which defines "principals" and CALJIC No. 3.01, which defines

---

[2]In exonerating Acero's codefendant Copeland of all charges, but convicting Acero of the attempted murder, the jury necessarily found Acero had aided and abetted some person other than Copeland in the commission of the crime.

"aiding and abetting."[3] The trial court refused to supplement these instructions with a *Yarber*[4] instruction delineating the intent required of one who aids and abets an attempted murder.

Sometime after Acero's conviction, *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], ruled CALJIC No. 3.01 erroneously defines aiding and abetting by failing to adequately inform the jury of the requisite criminal intent for aiding and abetting. The Supreme Court held "the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of the offense." (*Id.*, at p. 560.) *People* v. *Caldwell* (1984) 36 Cal.3d 210, 224 [203 Cal.Rptr. 433, 681 P.2d 274], decided shortly after *Beeman,* determined CALJIC No. 3.00 is also defective in failing to adequately inform the jury of the requisite criminal intent for aiding and abetting by defining a "principal" simply as one who acts with knowledge of the unlawful purpose of the perpetrator. Both instructions have been revised by the CALJIC Committee in light of the Supreme Court pronouncements in *Beeman* and *Caldwell.*[5]

---

[3]CALJIC No. 3.00 (1981 rev.) as given provides: "The persons concerned in the commission [or attempted commission] of a crime who are regarded by law as principals in the crime thus committed [or attempted] and equally guilty thereof include:

"1. Those who directly and actively commit or attempt to commit the act constituting the crime, or

"[2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits [or attempts to commit] the crime, aid and abet in its commission [or attempted commission] [or]

"[3. Those who, whether present or not at the commission [or attempted commission] of the crime, advise and encourage its commission [or attempted commission].]

"[One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

CALJIC No. 3.01 (1980 rev.) as given provides: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime.

"[Mere presence at the scene of the crime which does not in itself assist in the commission of the crime does not amount to aiding and abetting.]

"[Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]"

[4]*People* v. *Yarber* (1979) 90 Cal.App.3d 895, 916 [153 Cal.Rptr. 875].

[5]CALJIC No. 3.00 (1984 rev.) now provides: "The persons concerned in the [commission] [or] [attempted commission] of a crime who are regarded by law as principals in the crime thus [committed] [or] [attempted] and equally guilty thereof include:

"1. Those who directly and actively [commit] [or] [attempt to commit] the act constituting the crime, or

"2. Those who aid and abet the [commission] [or] [attempted commission] of the crime.

"[One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly and intentionally aided or encouraged.]"

CALJIC No. 3.01 (1984 rev.) now provides: "A person aids and abets the [commission]

B. *Instruction on Requisite Intent for Attempted Murder*

In declaring CALJIC No. 3.01 "erroneous," *Beeman* noted: "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], *the aider and abettor must share the specific intent of the perpetrator.* . . . [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (35 Cal.3d 547, 560; italics added.)

■ The specific intent to kill is a necessary element of attempted murder. (*People* v. *Collie* (1981) 30 Cal.3d 43, 62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) As *Beeman* declares, to convict an aider and abettor of attempted murder, therefore, a jury must find the aider and abettor shared the perpetrator's specific intent to kill.

■ The jury here was not instructed it must find both Acero and the stabber harbored a specific intent to kill in order to convict Acero of attempted murder. The jury in fact was instructed to the contrary, informed the requisite intent could be inferred merely from the perpetrator's commission of another dangerous crime. The trial court instructed: "In the crime charged in Count 1, attempted murder, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator, and unless such specific intent exists, the crime to which it relates is not committed. The specific intent required is included in the definition of the crime charged.

" . . . . . . . . . . . . . . . . . . . . . . .

"The defendant is charged in Count 1 of the Information with the commission of the crime of attempted murder, a violation of section 664/187 of the Penal Code. The crime of attempted murder is the attempted unlawful killing of a human being with malice aforethought.

---

[or] [attempted commission] of a crime when he or she,
"(1) with knowledge of the unlawful purpose of the perpetrator and
"(2) with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, by act or advice aids, promotes, encourages or instigates the commission of the crime. "[A person who aids and abets the [commission] [or] [attempted commission] of a crime need not be personally present at the scene of the crime.]
"[Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.]
"[Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]"

"In order to prove the commission of the crime of attempted murder, each of the following elements must be proved: That there was an attempt to kill a human being; that the attempt to kill was unlawful; that the attempt to kill was done with malice aforethought.

"Malice is either express or implied.

"Malice is express when there is manifested an intention to unlawfully kill a human being. Malice is implied when the killing results from the intentional act involving a high degree of probability that it will result in death, which act was done for a base anti-social purpose and with a wanton disregard for human life.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought. The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person being killed."

In rebuttal argument, the prosecutor emphasized *specific intent to kill* was not "necessarily require[d]" to convict of attempted murder: "[T]he law does not necessarily require the specific intent to kill someone to be guilty of murder. What you have to have in your head is what is referred to as malice aforethought, and you will receive an instruction on that. You will receive a definition of attempted murder.

"Attempted murder has three elements, and you have to find each element to exist: That there was an attempt to kill, that the attempt to kill was unlawful—clearly, there was no lawful purpose in stabbing Mr. Queen— and that the attempt to kill was done with malice aforethought.

"Malice aforethought is when, one, you expressly intend to kill; and two, when it results—it says malice is implied when the killing results. Here we don't have a killing, so you have to draw the analogy to attempt. From an intentional act involving a high degree of probability that it will result in death, which is done for a base anti-social purpose and with wanton disregard for human life.

"Was it an intentional act? It wasn't an accidental stabbing. It was an intentional stabbing. Was there a high degree of probability it would result from [*sic*] death? You heard from the doctors and by Mrs. Vasquez, a ten-year nurse, and paramedics getting there, he would have died. There was definitely a high probability of death.

"Was it done for a base anti-social purpose? Was there any social purpose in stabbing Mr. Queen? There was not. Was it done with wanton disregard for human life? Look at what they did to him. What the stabber did to him. Was there any concern there or care for human life?

*"Do not be misled or fooled by saying Mr. Acero never intended to kill him, therefore, he can't be guilty of attempted murder. That is not the law.*

". . . . . . . . . . . . . . . . . . . . . . . .

"First of all, I offer to you, ladies and gentlemen, the coming back there and pointing the gun at somebody is aiding and abetting. Now, the mere fact these people are starting to run out, and Mr. Acero becomes afraid because people are starting to come out and starts to back up, does not eliminate the crime. The crime occurred, ladies and gentlemen, realistically, really when they got out of that car and started making the move for the house. *There is intent to commit a serious assault.* They are armed with weapons, and they carry some overt act in that regard." (Italics added.)

The Attorney General concedes, as he must, both the instructions and argument excerpted above were erroneous, as "[a]ttempted murder can only be based on a finding of express malice (intent to kill). (*People* v. *Johnson* (1981) 30 Cal.3d 444, 447-449; *People* v. *Collie* (1981) 30 Cal.3d 43, 62; *People* v. *Murtishaw,* 29 Cal.3d 733, 762-764.)" The Attorney General contends, however, no prejudice resulted from the incorrect instruction and argument (*Murtishaw* error). We come to a contrary conclusion in II B, *infra.*

## II

### STANDARD OF PREJUDICE

#### A. *Beeman Error*

In *People* v. *Beeman, supra,* 35 Cal.3d 547, the California Supreme Court was asked to hold that failure to instruct on criminal intent violates due process by removing the element of intent from the jury's consideration and thus requires automatic reversal of a conviction. *Beeman* noted the United States Supreme Court split four to four in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [73 L.Ed.2d 823, 103 S.Ct. 969], on the question of whether *Sandstrom*[6] error (due process violation resulting from instruction with a presumption that relieves or lightens the prosecution's constitutional

---

[6]*Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450].

duty to prove every element of a criminal offense beyond a reasonable doubt) requires reversal per se or may be reviewed for prejudice under the *Chapman*[7] standard applicable to errors of federal constitutional dimension. (*Beeman, supra,* 35 Cal.3d 547, 561, fn. 4.) In *Beeman* the court found the error at issue here prejudicial even under the most lenient *Watson*[8] standard. The court therefore found it unnecessary to decide whether failure to instruct on criminal intent "should as a general rule" be reviewed under a stricter standard and expressly left the question for another day. (*Id.,* at p. 563.) *Beeman* did note, however: "While the error which flows from the giving of CALJIC No. 3.01 is not identical to a conclusive presumption or to placing the burden of persuasion on the defendant [citation], it is just as effective—if not more effective—in removing the issue of intent from the jury's consideration. [Citation.]" (35 Cal.3d 547, at p. 561, fn. 4.)

The prejudice standard for *Beeman* error is thus at present an open ques- Acero asserts *Beeman* error is reversible per se under the federal Constitution. In addition, he urges the error deprives a defendant of his right under the California Constitution to have the jury determine every material issue presented by the evidence, and thus constitutes a miscarriage of justice under the state Constitution, no matter how substantial the evidence of guilt may seem. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].)

Instruction with CALJIC Nos. 3.00 and 3.01 effectively removed the issue of criminal intent from the jury's consideration by allowing the jury to convict Acero of attempted murder without finding he *intentionally* aided or encouraged the offense. As *Sandstrom* suggests: " '[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every* fact necessary to constitute the crime with which he is charged.' " (442 U.S. 510, 520 [61 L.Ed.2d 39, p. 48], quoting *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) *People* v. *Modesto, supra,* echoes this fundamental notion, in stating "the defendant has a constitutional right to have the jury determine every material issue presented by the evidence." (59 Cal.2d 722, 730.) (See *People* v. *Yepez* (1984) 159 Cal.App.3d 1179 [206 Cal.Rptr. 276].)

Our Supreme Court's most recent pronouncement on the effect of misinstruction on the intent required for a finding of a felony-murder special circumstance under the 1978 death penalty initiative (Pen. Code, § 190.2, subd. (a)(17)), in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], enlightens our determination of the review standard

---

[7]*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

[8]*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

here. *Garcia* held proof of intent to kill or to aid a killing was essential to a finding of the special circumstance, and under controlling decisions of the United States Supreme Court [*Winship, Sandstrom,* and *Connecticut v. Johnson, supra,* among others] the failure to instruct upon intent as an element of a special circumstance, because it takes the issue of intent from the trier of fact, denies the defendant due process of law in violation of the Fourteenth Amendment. (*People v. Garcia, supra,* at pp. 549-544.) Upon careful analysis, the Supreme Court concluded the failure to instruct on intent required reversal in all cases except those where (1) the defendant concedes intent; (2) the jury finds the defendant intended to kill in connection with some other proper instruction; and (3) the evidence establishes intent to kill as a matter of law. (*Ibid.*)

*Beeman* error, just as the error in *Garcia,* results in jury failure to examine evidence which bears on intent, an essential element of the offenses at issue in both cases. Such error is therefore reversible per se, as *Garcia* suggests. This case does not fall within the *Garcia* exceptions to mandatory reversal. Acero does not concede the intent issue. The jury could not have resolved the issue under other proper instruction, and there is little to no evidence Acero intended to aid a killing (he suggests the group only returned to Vasquez' party to steal beer and escort a woman home). We therefore conclude reversal is required here.[9]

---

[9]Numerous appellate divisions have grappled with the *Beeman* standard of prejudice issue and a Supreme Court pronouncement as to the appropriate standard is forthcoming. The Court of Appeal for the Second Appellate District, Division Four, under reasoning quite similar to that in *Garcia,* held *Beeman* error reversible per se under the federal Constitution, in *People v. Johnson* (Cal.App.) (hg. granted July 26, 1984, Crim. 23867). The Second District, Division Seven, similarly held in *People v. Franklyn* ▌(Cal.App.), citing *Johnson, Beeman* error reversible per se under the state and federal Constitutions. The People's petition for hearing is pending before our Supreme Court. In *People v. Banks* (1983) 147 Cal.App.3d 360 [195 Cal.Rptr. 101], the Fifth Appellate District, Division Four, with little substantive discussion, ruled *Chapman* the proper review standard for *Beeman* error.

The First District, Divisions One and Two, and the Second District, Divisions Three and Five, declined to choose between the *Watson* and *Chapman* standards, and ruled *Beeman* error harmless under both standards, given the facts of the particular cases in *People v. Clay* (1984) 153 Cal.App.3d 433, 462-463 [200 Cal.Rptr. 269]; *People v. Parker* ▌(Cal.App.); *People v. Gilman* (1984) 156 Cal.App.3d 760, 764-766 [203 Cal.Rptr. 6] (hg. den. July 26, 1984); and *People v. Davis* ▌(Cal.App.). The petitions for hearing in *Parker* and *Davis* are pending in the Supreme Court.

Finally, the Fifth Appellate District declined to address the appropriate test of prejudice, ruling whatever the test, reversal was not demanded in *People v. Olson* (Cal.App.) (hg. den. July 26, 1984; opn. ordered unpublished). That court apparently failed to recognize the possibility that *Beeman* error triggers per se reversal, noting: "We need not address the issue of the appropriate test of prejudice—that is, whether we apply the *People v. Watson, supra,* 46 Cal.2d 818, harmless error test or the more stringent harmless beyond a reasonable doubt test in *Chapman v. California* (1967) 386 U.S. 18 . . .—because under either test, the error is not reversible."

## B. *Murtishaw Error*

While *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 765, applied the *Watson* standard in determining whether misinstruction on the requisite intent for attempted murder was prejudicial to its defendant, the court did so with no discussion of the appropriateness of the *Watson* standard or of alternative standards of prejudice. *People* v. *Johnson, supra,* 30 Cal.3d 444, 448-449, and *People* v. *Ramos* (1982) 30 Cal.3d 555, 584 [180 Cal.Rptr. 266, 639 P.2d 908], which followed *Murtishaw,* simply applied *Watson,* citing *Murtishaw.*

*People* v. *Collie, supra,* 30 Cal.3d 43, 62, without citation to *Murtishaw* or *Watson,* reversed an attempted second degree murder conviction for *Murtishaw* error on the ground it was "impossible to determine whether the verdict rested on [the ground the defendant had a specific intent to kill, on which the jury was properly instructed], for which there was little evidence, or on the impermissible basis of defendant's wanton conduct, which was more clearly supported by the record." From this discussion, it is unclear whether the *Collie* court was applying the *Watson* or *Chapman* prejudice standard.

In view of the current debate over the standard of review in cases of *Beeman* error, invited by *Beeman*'s disinclination to adopt a "general rule" (35 Cal.3d 547, 563) for scrutiny of *Beeman* error, the use of the *Watson* test for review of *Murtishaw* error is open to criticism.

Because *Murtishaw* error involved misinstruction on a necessary element of the criminal offense of attempted murder, the mens rea with which the *actus reus* was performed, it, just as *Beeman* error, triggers reversal in all cases on both state and federal constitutional grounds. (See II A, *ante.*) Independent of *Beeman* error, reversal is required here.

Even assuming the *Watson* or *Chapman* standard is the appropriate test of prejudice, reversal of Acero's conviction is nonetheless required. Acero's jury was instructed on both express malice, for which there was a paucity of evidence in the record, and implied malice, which was more clearly supported in the record. We cannot know whether the jury convicted him of attempted murder under the former, correct instruction or the latter, incorrect instruction. (See *People* v. *Johnson, supra,* 30 Cal.3d 444, 449.)

The judgment is reversed.

Brown, (Gerald), P. J., concurred.

**DUFFY, J.**\*—I respectfully dissent on the basis I do not believe the error in giving CALJIC No. 3.01 without appropriate *Beeman* modification reaches the level of a constitutional substantive due process violation in every case. In line with California Constitution article VI, section 13, the appellate court in each case must make "an examination of the entire cause, including the evidence," in determining whether reversible error occurred. As a general proposition, I believe there is no prejudicial error in failing to comply with *Beeman* where there is a record showing defendant's direct, active participation in the crime accompanied by other instructions adequately detailing the mental elements necessary to be such an active principal in committing that crime and an absence of evidence from which a reasonable inference is the defendant did not entertain the requisite intent. Acero's case record presents such a situation not requiring reversal.

When the group of uninvited intruders returned to the party at 4:30 a.m. announcing "We are back, and we are going to stab you," the criminal purpose of each member of the group was made clear—each shared an intent to stab, a very close relative of intent to kill. There was no room for a reasonable inference any member of that group, including the rifle-carrying Acero, did not share that announced criminal purpose. As the stabbing of Queen began, the intent to kill came into full fruition. Further, when Acero hit Queen with the butt end of the rifle as he was being stabbed in the chest repeatedly, Acero's shared intent to kill became even more clear. No room for any reasonable inference to the contrary exists.

In *People* v. *Beeman* (1984) 35 Cal.3d 547, at pages 557 and 558 [199 Cal.Rptr. 60, 674 P.2d 1318], the court approvingly quoted from *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], as follows: " '[t]he . . . synthesis that intent is inferred from the knowledge by the aider and abettor of the perpetrator's purpose is sound, generally, as a matter of human experience, but we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn. Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred. In the absence of evidence to the contrary, the intent may be regarded as established.* But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice.' (Fn. omitted; original italics.) (90 Cal.App.3d at p. 916.)" (Italics added.)

In *Yarber,* the codefendant wife, found guilty of oral copulation (Pen. Code, § 288a, subd. (c)) as an aider and abettor, orally copulated her hus-

---

\*Assigned by the Chairperson of the Judicial Council.

band in the presence of a young female victim. The crime of which wife was found guilty was committed when the victim followed the wife's activity with the husband and orally copulated him, without request by the wife and for a reason the victim testified she did not know. Codefendant wife had asked the victim to perform the same act on husband three days earlier. *Yarber* held under the standard CALJIC No. 3.01 instruction given, the jury could have believed the wife was guilty because her act encouraged the victim to engage in the oral copulation with the husband and she had knowledge of the husband's purpose, without regard to whether she intended that her act would have such effect (90 Cal.App.3d at pp. 916-917). The court pointed out that under the facts it could be inferred wife orally copulated husband to encourage and induce the victim to follow suit, but an equally strong inference was wife did so for her own purposes and without regard for whether the victim followed suit (90 Cal.App.3d at p. 911). Thus, *Yarber* involved a codefendant, wife, who did not actively and directly participate in the events constituting the charged crime. There were facts from which it would be reasonable to infer the codefendant neither shared her codefendant's criminal intent nor had the intent or purpose of committing, encouraging, or facilitating the commission of the crime. Applying "reasonably probable" language as in the *Watson* test of reversible error (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]—"it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"), *Yarber* reversed the judgment of conviction against wife (90 Cal.App.3d at pp. 916-917).

Similarly, in *Beeman, supra,* 35 Cal.3d 547, Beeman was not present when the crimes in question were committed and there was evidence, including evidence of communicated advanced withdrawal from the burglary-robbery scheme carried out by the codefendants, from which a jury could reasonably infer Beeman neither shared the other participants' intent nor had the purpose of committing, encouraging, or facilitating commission of the offenses when he did acts from which the contrary inference could also be drawn.[1] In determining the question of prejudice, *Beeman* emphasized

---

[1]*Beeman* describes the state of the evidence as follows: "The prosecution produced considerable evidence which showed that appellant in fact aided the robbery. The prosecution's evidence also sought to show that he had participated extensively in the planning of the robbery and agreed beforehand to sell the jewelry for a percentage of its value, but refused to be present when the offenses were committed.

"Appellant did not deny that he had given information to Burk and Gray which aided their criminal enterprise, but he claimed his purposes in doing so were innocent. [He testified that he had mentioned the victim's jewels and car only casually and that he had drawn the floor plan only for the purpose of discussing the design of the house.] Appellant admitted that he was at some time made aware of his friends' intent to rob Mrs. Beeman [Beeman's sister-in-law], but insisted that he had repeatedly stated that he wanted nothing to do with a robbery of his relatives. He testified that he didn't think Burk would really go through with the robbery or that Gray would help. Two days before the incident, he again told Gray that

two features in the case, first, "appellant's defense focused on the question of his intent" (35 Cal.3d at p. 562) and, second, "the jury interrupted its deliberations to seek further instruction regarding accomplice liability" (*ibid.*). *Beeman* thus concluded: "Under these circumstances, where the defense centered on the very element as to which the jury was inadequately instructed and the jurors' communication to the court indicated confusion on the same point, we cannot find the error harmless. Even applying the most lenient *Watson* standard, we find that in this case it is reasonably probable that the jury would have reached a result more favorable to appellant had it been correctly instructed upon the mental element of aiding and abetting. (*People* v. *Watson, supra,* 46 Cal.2d 818.) Because we reverse under *Watson* we do not in this case decide whether failure to correctly instruct on the element of criminal intent should as a general rule be reviewed under a stricter rule of harmless error." (35 Cal.3d at pp. 562-563.)

*Beeman* merely applied the *Watson* test as well.

In determining reversible error, I would follow the factually analogous pre-*Beeman* case of *People* v. *Banks* (1983) 147 Cal.App.3d 360, 367-368 [195 Cal.Rptr. 101]. Banks was found guilty of first degree murder as an aider and abettor. He and the codefendant Vieyra were in the process of stealing their employer's safe when they were surprised by a visit from a supervisor, victim Kennemore. At Vieyra's request, Banks handed him a knife and Vieyra proceeded to kick the victim and stab him repeatedly. Banks hit and punched the victim during the stabbing and himself displayed but did not otherwise use a knife. Considering the prejudicial effect of *Yarber* error, *Banks* cited *People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892] [failure to instruct that specific intent to steal is an element of robbery not reversible where the evidence permitted no interpretation other than that the defendant entertained such intent when he demanded the victim's money at gunpoint] and *People* v. *Thornton* (1974) 11 Cal.3d 738, 768 [114 Cal.Rptr. 467, 523 P.2d 267], footnote 20 (overruled on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]) [failure to instruct on a charge of kidnaping for purposes of robbery that the asportation must be significant in time or space and must substantially increase the risk of harm to the victim over and above that present in the crime of robbery not reversible error where there was no evidence worthy of consideration to support an inference to the con-

---

he didn't want to be involved. Gray's testimony confirmed that appellant had twice said he did not want to be involved. Finally, appellant claimed to have taken possession of the jewelry and feigned attempts to sell it in order to recover the property and return it to the victims. Thus, the essential point of his defense was that although he acted in ways which in fact aided the criminal enterprise, he did not act with the intent of encouraging or facilitating the planning or commission of the offenses." (35 Cal.3d at p. 562.)

trary]. *Banks* then concluded: "This is not a case where it can be said that the jury could reasonably have found that appellant with knowledge of Vieyra's purpose aided him without criminal intent. Lack of intent was raised neither by the evidence nor by argument by either the prosecution or defense counsel. [Fn. omitted.] Nor is there any evidence worthy of consideration to support an inference that appellant lacked the requisite intent. We therefore conclude that it is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the instructional error. (*People* v. *Watson* . . . 46 Cal.2d 818, 836 . . . ; Cal. Const., art. VI, § 13.)" (147 Cal.App.3d at pp. 367-368.)

In connection with another issue, *Banks* also said: "It distorts reality to suggest that a jury could reasonably conclude that appellant was acting without intent to aid Vieyra in the commission of the murder when appellant handed Vieyra a knife, put another knife in his own pocket and joined in striking Kennemore while Vieyra struck and stabbed him. No evidence supports such a conclusion and it was not even suggested by counsel in his argument to the jury." (*People* v. *Banks, supra,* 147 Cal.App.3d 360, 369.) This view of the evidence applies with equal force to the record in Acero's case.

Acero's alibi defense did not raise an issue of lack of intent in the commission of the stabbing. The alibi merely said he was not involved at all. This factor and the absence of an inquiry on the subject of intent from the jury distinguish the case from *Beeman.* Acero's case is one where there was an "absence of evidence to the contrary" (*People* v. *Yarber, supra,* 90 Cal.App.3d 895, 916) with reference to his criminal intent and under the pre-*Beeman* version of CALJIC No. 3.01 "the intent may be regarded as established" (*ibid.*).

The fact the requisite intent may be regarded as established under the *Yarber* language approved in *Beeman* also distinguishes Acero's case from cases such as *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in both of which there was a total absence of any instruction on the necessity of intent to kill for purposes of the felony-murder special circumstances provision of the 1978 death penalty initiative. Under no theory in those cases could a court regard the requisite intent as established for purposes of applying the initiative's severe penalty provisions of death or life in prison without parole. Thus, there was an absence of a jury determination of an element essential to imposing the penalty. Accordingly, in *Garcia* and *Carlos,* the due process clause and attendant standard of reversible error per se came into operation (see *People* v. *Garcia, supra,* 36 Cal.3d 539, 554). Since in Acero's case intent to kill can be

regarded as established under the evidence presented and instructions given, his case is not subject to the *Garcia-Carlos* standard.

As to the *Murtishaw* error, the same general analysis applies to the absence of a specific intent to kill instruction, since the jury was properly instructed on express malice and there was no reasonable basis for concluding the jury found otherwise than that Acero had the specific intent to kill as he pummeled the stabbed victim with the rifle butt (*People* v. *Ramos* (1982) 30 Cal.3d 553, 584, fn. 13 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765 [175 Cal.Rptr. 738, 631 P.2d 446]).

I would affirm.

Respondent's petition for a hearing by the Supreme Court was denied January 3, 1985.